## TRBOVICH *v.* UNITED MINE WORKERS OF AMERICA ET AL.

No. 71–119.   Argued November 18, 1971—Decided January 17, 1972

*Joseph L. Rauh, Jr.,* argued the cause for petitioner. With him on the briefs were *John Silard, Elliott C. Lichtman, Joseph A. Yablonski,* and *Clarice R. Feldman.*

*Solicitor General Griswold* argued the cause for respondent Secretary of Labor. With him on the brief were *Assistant Attorney General Gray, Harry R. Sachse, Walter H. Fleischer, Raymond D. Battocchi, Richard F. Schubert, George T. Avery,* and *Beate Bloch. Edward L. Carey, Harrison Combs, Willard P. Owens, Charles L. Widman,* and *M. E. Boiarsky* filed a brief for respondent United Mine Workers of America.

*Melvin L. Wulf* and *Sanford Jay Rosen* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The Secretary of Labor instituted this action under § 402 (b) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 73 Stat. 534, 29 U. S. C. § 482 (b), to set aside an election of officers of the United Mine Workers of America (UMWA), held on December 9, 1969. He alleged that the election was held in a manner that violated the LMRDA in numerous respects,[1] and he sought an order requiring a new election to be held under his supervision.

Petitioner, a member of the UMWA, filed the initial complaint with the Secretary that eventually led him to file this suit. Petitioner now seeks to intervene in the litigation, pursuant to Fed. Rule Civ. Proc. 24 (a), in order (1) to urge two additional grounds for setting aside

---

[1] The complaint alleged that the Union violated the Act by, *inter alia,* failing to use secret ballots, permitting campaigning at the polls, denying candidates the right to have observers at polling places and at the counting of ballots, subjecting members to reprisals in connection with their election activities, failing to conduct elections in some locals, and using union assets to promote the candidacy of the incumbents.

the election,[2] (2) to seek certain specific safeguards with respect to any new election that may be ordered,[3] and (3) to present evidence and argument in support of the Secretary's challenge to the election. The District Court denied his motion for leave to intervene, on the ground that the LMRDA expressly stripped union members of any right to challenge a union election in the courts, and gave that right exclusively to the Secretary. *Hodgson v. United Mine Workers*, 51 F. R. D. 270 (1970). The Court of Appeals affirmed on the basis of the District Court opinion, 77 L. R. R. M. 2496 (CADC 1971). We granted certiorari to determine whether the LMRDA imposes a bar to intervention by union members under Rule 24, in a suit initiated by the Secretary. *Post,* p. 880.[4] We conclude that it does not, and we remand the case to the District Court with directions to permit intervention.

I

The LMRDA was the first major attempt of Congress to regulate the internal affairs of labor unions.[5] Having conferred substantial power on labor organizations, Con-

---

[2] Petitioner alleged as additional violations of the Act (1) that the Union required members to vote in certain locals, composed entirely of pensioners, which petitioner claims are illegally constituted under the UMWA Constitution; and (2) that the incumbent president improperly influenced the pensioners' vote by bringing about a pension increase just before the election.

[3] Petitioner asks the court to order the Union to disband the pensioner locals, to publish a ruling to the effect that the president breached his fiduciary duty by bringing about the pension increase, and to establish new comprehensive rules to govern future elections.

[4] We expedited consideration of this case in view of the fact that the litigation is presently pending in the District Court and it has not been stayed.

[5] See generally Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv. L. Rev. 851 (1960); Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L. Rev. 819 (1960).

gress began to be concerned about the danger that union leaders would abuse that power, to the detriment of the rank-and-file members. Congress saw the principle of union democracy as one of the most important safeguards against such abuse, and accordingly included in the LMRDA a comprehensive scheme for the regulation of union elections.

Title IV of the statute establishes a set of substantive rules governing union elections, LMRDA § 401, 29 U. S. C. § 481, and it provides a comprehensive procedure for enforcing those rules, LMRDA § 402, 29 U. S. C. § 482. Any union member who alleges a violation may initiate the enforcement procedure. He must first exhaust any internal remedies available under the constitution and bylaws of his union. Then he may file a complaint with the Secretary of Labor, who "shall investigate" the complaint. Finally, if the Secretary finds probable cause to believe a violation has occurred, he "shall . . . bring a civil action against the labor organization" in federal district court, to set aside the election if it has already been held, and to direct and supervise a new election. With respect to elections not yet conducted, the statute provides that existing rights and remedies apart from the statute are not affected. But with respect to an election already conducted, "[t]he remedy provided by this subchapter . . . shall be exclusive." LMRDA § 403, 29 U. S. C. § 483.

The critical statutory provision for present purposes is § 403, 29 U. S. C. § 483, making suit by the Secretary the "exclusive" post-election remedy for a violation of Title IV. This Court has held that § 403 prohibits union members from initiating a private suit to set aside an election. *Calhoon* v. *Harvey*, 379 U. S. 134, 140 (1964). But in this case, petitioner seeks only to participate in a pending suit that is plainly authorized by the statute; it cannot be said that his claim is

defeated by the bare language of the Act. The Secretary, relying on legislative history, argues that § 403 should be construed to bar intervention as well as initiation of a suit by the members. In his view the legislative history shows that Congress deliberately chose to exclude union members entirely from any direct participation in judicial enforcement proceedings under Title IV. The Secretary's argument rests largely on the fact that two alternative proposals figured significantly in the legislative history of Title IV, and each of these rejected bills would have authorized individual union members to bring suit. In the words of the District Court:

> "We think the fact that Congress considered two alternatives—suit by union members and suit by the Secretary—and then chose the latter alternative and labelled it 'exclusive' deprives this Court of jurisdiction to permit the former alternative via the route of intervention." 51 F. R. D., at 272.

That argument misconceives the legislative history and misconstrues the statute. A review of the legislative history shows that Congress made suit by the Secretary the exclusive post-election remedy for two principal reasons: (1) to protect unions from frivolous litigation and unnecessary judicial interference with their elections, and (2) to centralize in a single proceeding such litigation as might be warranted with respect to a single election. Title IV as enacted serves these purposes by referring all complaints to the Secretary so that he can screen out frivolous ones, and by consolidating all meritorious complaints in a single proceeding, the Secretary's suit in federal district court. The alternative proposals were rejected simply because they failed to accomplish these objectives. There is no evidence whatever that Congress was opposed to participation by union members

in the litigation, so long as that participation did not interfere with the screening and centralizing functions of the Secretary.

The enforcement provisions of Title IV originated in a bill introduced by Senator John Kennedy in 1958. That bill, S. 3751, provided for suit by the Secretary as the exclusive remedy for violation of the rules relating to union elections. Senator Kennedy described the bill as a "modest proposal," one which would protect union members "without undue interference in the internal affairs of what I believe are essentially private institutions—that is, American trade unions." 104 Cong. Rec. 7954. The Senate passed an expanded version of the bill, S. 3974, which retained the original enforcement scheme, and reflected a continuing legislative interest in minimizing judicial interference with union elections. See S. Rep. No. 1684, 85th Cong., 2d Sess., 12–15 (1958). That bill was defeated in the House of Representatives, 104 Cong. Rec. 18288, but essentially the same enforcement scheme was retained the following year in S. 1555, the Kennedy-Ervin bill which was ultimately passed by both Houses and enacted into law.

In the Senate, the principal advocate of a provision authorizing individual union members to bring suit was Senator Barry Goldwater. He introduced a bill, S. 748, endorsed by the Administration, that would have authorized both the Secretary and the members to file suit to enforce the rules relating to union elections.[6] During

---

[6] The Goldwater-Administration bill provided that a member could file suit with respect to any violation of the election title unless that claimed violation was the subject of a pending action by the Secretary. It also provided that enforcement suits could be filed in either state or federal courts. The question of member suits was, throughout the debates, intertwined with the question of preserving pre-existing state remedies, since prior to the enact-

the Senate Hearings, a number of witnesses compared the enforcement provisions of the two bills. The primary objection to the provision for member suits in the Goldwater bill was that it might lead to multiple litigation in multiple forums, and thereby impose on the union the severe burden of mounting multiple defenses. A related objection was that the Goldwater bill failed to interpose a screening mechanism between the dissatisfied union member and the courtroom, and thereby imposed on the union the burden of responding to frivolous complaints.

Perhaps the most vehement opposition to the Goldwater bill came from the AFL–CIO. Its spokeman, Andrew Biemiller, testified that "[t]he bill would result in placing union officers in a straitjacket since they could be haled into court, virtually without limitation, to defend union policies or programs in suits brought against them by any dissident union member [or] minority group." Hearings on S. 505 et al. before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 86th Cong., 1st Sess., 567 (1959); see also *id.*, at 578–579 (analysis of S. 748 by Arthur J. Goldberg, then special counsel to the AFL–CIO). Mul-

---

ment of the LMRDA the only remedy for illegal election conduct was a member suit in state court.

Pre-existing state remedies presented the additional problem, not relevant here, of multiple litigation that was not only inconvenient as a matter of procedure but also in conflict as a matter of substance, for the state remedies related to state-defined rights that were not always identical to the new rights defined in the LMRDA. The debates reflect great concern with the proper relationship between state and federal remedies, and much less concern with the relationship between private and public enforcement. See, *e. g.,* S. Rep. No. 187, 86th Cong., 1st Sess., 19–22, 101–104 (1959) (majority and minority views); Hearings on H. R. 3540 et al. before a Joint Subcommittee of the House Committee on Education and Labor, 86th Cong., 1st Sess., pt. 4, p. 1611 (1959) (analysis of S. 1555 by Sen. Goldwater), reprinted at 105 Cong. Rec. 10102.

tiple litigation and unnecessary harassment, then, were seen as the principal evils of the provision for member suits. And it was precisely those evils that the draftsmen of the Kennedy-Ervin bill sought to avoid. According to Professor Archibald Cox, who was a principal consultant to the draftsmen, the Kennedy proposal made suit by the Secretary the exclusive post-election remedy in order to "centralize control of the proceedings," to adjudicate the validity of an election "once and for all in one forum," and to avoid "unnecessary harassment of the union on one side and . . . friendly suits aimed at foreclosing the Secretary's action on the other." *Id.*, at 135.

Thus, when the Senate Committee reported out the Kennedy-Ervin bill rather than its competitor, it is reasonable to infer that the Committee, and later the Senate, regarded the provision for exclusive enforcement by the Secretary as a device for eliminating frivolous complaints and consolidating meritorious ones. There is no basis whatever for the further conclusion suggested by the Secretary, that the Senate opposed any form of direct participation by union members in Title IV enforcement litigation.

The legislative history in the House of Representatives provides even less support for the Secretary's position. The House initially rejected the Senate bill and passed an alternative authorizing only union members, and not the Secretary, to bring suit to enforce the election title of the bill. H. R. 8342, see H. R. Rep. No. 741, 86th Cong., 1st Sess., 15–17 (1959). Even Senator Goldwater, the leading advocate of member suits, thought the House bill inferior to the Senate bill in this regard, because the matter of election violations was too important to be left exclusively to the vagaries of private enforcement. 105 Cong. Rec. 16489 (comparison of House and Senate bills by Sen. Goldwater). The Conference Committee and the House ultimately adopted the Senate's enforce-

ment provisions, thereby affirming the need for public enforcement of Title IV. See H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 35 (1959). That action, however, can in no sense be read as a rejection of all forms of private participation in enforcement litigation, since the House at no time considered the possibility that union members might assist the Secretary rather than displace him.

With respect to litigation by union members, then, the legislative history supports the conclusion that Congress intended to prevent members from pressing claims not thought meritorious by the Secretary, and from litigating in forums or at times different from those chosen by the Secretary. Only if intervention would frustrate either of those objectives can the statute fairly be read to prohibit intervention as well as initiation of suits by members.

## II

Intervention by union members in a pending enforcement suit, unlike initiation of a separate suit, subjects the union to relatively little additional burden.[7] The principal intrusion on internal union affairs has already been accomplished, in that the union has already been summoned into court to defend the legality of its election. Intervention in the suit by union members will not subject the union to burdensome multiple litigation, nor will it compel the union to respond to a new and potentially groundless suit. Thus, at least insofar

---

[7] For the origins and development of the procedural device of intervention, see Moore & Levi, Federal Intervention, 45 Yale L. J. 565 (1936), 47 Yale L. J. 898 (1938); Developments in the Law—Multi-party Litigation in the Federal Courts, 71 Harv. L. Rev. 874, 897–906, 988–992 (1958). The distinction between intervention and initiation is thoughtfully discussed in Shapiro, Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators, 81 Harv. L. Rev. 721, 726–729 (1968).

as petitioner seeks only to present evidence and argument in support of the Secretary's complaint, there is nothing in the language or the history of the LMRDA to prevent such intervention.

The question is closer with respect to petitioner's attempt to add to the Secretary's complaint two additional grounds for setting aside the union election. These are claims that the Secretary has presumably determined to be without merit. Hence, to require the union to respond to these claims would be to circumvent the screening function assigned by statute to the Secretary. We recognize that it is less burdensome for the union to respond to new claims in the context of the pending suit than it would be to respond to a new and independent complaint. Nevertheless, we think Congress intended to insulate the union from any complaint that did not appear meritorious to both a complaining member and the Secretary. Accordingly, we hold that in a post-election enforcement suit, Title IV imposes no bar to intervention by a union member, so long as that intervention is limited to the claims of illegality presented by the Secretary's complaint.[8]

## III

Finally, the Secretary argues that even if the LMRDA does not bar intervention, petitioner has no right to

---

[8] This limitation, however, applies only to the claimed grounds for setting aside the old election, and not to the proposed terms of any new one that may be ordered. For if the court finds merit in the Secretary's complaint and sets the election aside, then the statute requires the court to direct a new election in conformity with the constitution and bylaws of the union, and the requirements of Title IV. Since the court is not limited in this regard to consideration of remedies proposed by the Secretary, there is no reason to prevent the intervenors from assisting the court in fashioning a suitable remedial order. Cf. *Hodgson* v. *Steelworkers*, 403 U. S. 333, 344 (WHITE, J., dissenting).

intervene under the terms of Fed. Rule Civ. Proc. 24 (a). Rule 24 (a)(2) gives one a right to intervene if (1) he claims a sufficient interest in the proceedings, and (2) that interest is not "adequately represented by existing parties." [9]

The Secretary does not contend that petitioner's interest in this litigation is insufficient; he argues, rather, that any interest petitioner has is adequately represented by the Secretary. The court below did not reach this question, in light of its threshold determination that Rule 24 had no application to the case. Nevertheless, we think it clear that in this case there is sufficient doubt about the adequacy of representation to warrant intervention.[10]

The Secretary contends that petitioner's only legally cognizable interest is the interest of all union members in democratic elections, and he says that interest is identical with the interest represented by the Secretary in Title IV litigation. Hence he argues that petitioner's interest must be adequately represented unless the court is prepared to find that the Secretary has failed to perform his statutory duty. We disagree.

The statute plainly imposes on the Secretary the duty to serve two distinct interests, which are related, but not identical. First, the statute gives the individual

---

[9] Fed. Rule Civ. Proc. 24 (a):

"Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

[10] The requirement of the Rule is satisfied if the applicant shows that representation of his interest "may be" inadequate; and the burden of making that showing should be treated as minimal. See 3B J. Moore, Federal Practice ¶ 24.09-1 [4] (1969).

union members certain rights against their union, and
"the Secretary of Labor in effect becomes the union
member's lawyer" for purposes of enforcing those rights.
104 Cong. Rec. 10947 (remarks of Sen. Kennedy).
And second, the Secretary has an obligation to protect
the "vital public interest in assuring free and demo-
cratic union elections that transcends the narrower in-
terest of the complaining union member." *Wirtz* v.
*Local 153, Glass Bottle Blowers Assn.,* 389 U. S. 463,
475 (1968). Both functions are important, and they
may not always dictate precisely the same approach
to the conduct of the litigation. Even if the Secretary
is performing his duties, broadly conceived, as well as
can be expected, the union member may have a valid
complaint about the performance of "his lawyer." Such
a complaint, filed by the member who initiated the
entire enforcement proceeding, should be regarded as
sufficient to warrant relief in the form of intervention
under Rule 24 (a)(2).

The judgment is reversed and the case is remanded
to the District Court with directions to allow limited
intervention in accordance with this opinion.

*So ordered*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST
took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting in part.

I join the opinion of the Court to the extent that it
holds that Title IV of the Landrum-Griffin Act does
not bar intervention by union members, pursuant to
Fed. Rule Civ. Proc. 24 (a), in suits initiated by the
Secretary of Labor challenging union elections. I differ
from the majority, however, in that I would also permit
the union members in this case to raise their additional

grounds* for setting aside the disputed election. In my view, the limited intervention granted by the majority serves neither the purpose of the liberalizing 1966 amendments to Rule 24, nor the twin purposes of Title IV— to preserve unions from a multiplicity of frivolous election challenges, and also to centralize in a single proceeding such litigation as might be warranted with respect to a single election.

Here, the Secretary has served his screening function. He has decided that petitioner's election challenge is meritorious. The Court concedes, moreover, that the burden on the union to defend against the additional claims would not be particularly burdensome, compared to the onus of an independent action. *Ante,* at 537. These claims relate squarely to the election whose legality the union must defend. I would permit them to be heard.

---

*These claims both related to alleged manipulation of pensioners by the incumbents. One claim attacked so-called "bogus" locals, composed entirely of pensioners, which were "run" by the incumbents. The second claim was that the union president attempted improperly to influence the pensioners' vote by arranging for increased pension benefits just before the election.