RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0056p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

BEVERLY BLOUNT-HILL; MARCIA D.
CONNORS; PATRICIA LYNCH, President,
Dayton Education Association, OEA/NEA;
STACEY RANGE; KEVIN RANGE,
　　　　　　　　*Plaintiffs-Appellees,*

　　　*v.*

SUSAN TAVE ZELMAN; STATE OF OHIO,
BOARD OF EDUCATION; STATE OF OHIO
DEPARTMENT OF EDUCATION,
　　　　　　　　*Defendants-Appellees,*

　　　*v.*

HOPE ACADEMY NORTHWEST CAMPUS;
SHARONDA PERKINS; JESSICA VELASQUEZ;
ANTHONY ROBINSON; JENNIFER ROBINSON,
　　　　　　　　*Intervenors-Appellants.*

No. 09-3952

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 04-00197—Walter H. Rice, District Judge.

Decided and Filed: February 16, 2011

Before: KENNEDY, CLAY, and KETHLEDGE, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:** John B. Schomer, Donald W. Davis, Jr., BRENNAN, MANNA &
DIAMOND, LLC, Akron, Ohio, for Appellants. William J. Steele, Sue A. Salamido,
CLOPPERT, LATANICK, SAUTER & WASHBURN, Columbus, Ohio, Todd R. Marti,
OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.

　　　CLAY, J., delivered the opinion of the court, in which KENNEDY, J., joined.
KETHLEDGE, J. (pp. 15–17), delivered a separate dissenting opinion.

1

————————

**OPINION**

————————

CLAY, Circuit Judge. HOPE Academy Northwest Campus ("Hope Northwest"), a community school in Cleveland, Ohio; Sharonda Perkins, a social worker and mother of a student at HOPE Northwest; Jessica Z. Velasquez, the mother of a first grade student at HOPE Northwest; and Anthony and Jennifer Robinson, the parents of three students at HOPE Northwest (collectively, "proposed Intervenors"), appeal the district court's denial of their application to intervene as party defendants in the underlying action as a matter of right under Rule 24(a), and as a matter of discretion under Rule 24(b), of the Federal Rules of Civil Procedure. For the reasons set forth below, we **AFFIRM** the district court's decision.

**BACKGROUND**

This appeal arises from a challenge to the constitutionality of the Ohio Community Schools Act ("OCSA"), Ohio Rev. Code §§ 3314.01, *et seq*., and "the funding mechanism for public schools as it relates to community schools and as implemented by Defendant." (Third Am. Compl. ¶ 1.) The OCSA established a charter school system in Ohio comprised of "community schools," which operate as public schools that are "independent of any school district," O.R.C. § 3314.01, and exempt from many state laws. *Id.* § 3314.04. Although included in the "state's program of education," *id.* § 3314.01, a community school is governed by a contract between its founder and a statutorily authorized "sponsor." *Id.* § 3314.02(C)(1).

Authorized sponsors may include the state or local board of education, certain tax-exempt entities, the governing board of any educational service center, or authorities designated by a state university board. *Id.* Interested parties may establish a community school by converting an existing public school, or creating a new school in a "challenged school district," so long as an authorized sponsor agrees to enter into a contract. *Id.* § 3314.02(C). The statute defines a "challenged school district" as "mean[ing] any of

the following: (a) A school district that is part of the pilot project area; (b) A school district that is either in a state of academic emergency or in a state of academic watch under section 3302.03 of the Revised Code; [or] (c) A big eight school district," which the statute defines as a district meeting certain numerical thresholds. *See id.* §§ 3314.02(A)(3)-(4).

Because start-up community schools must be established in a "challenged school district," Plaintiffs argue that the OCSA disproportionately benefits minority students because, as Plaintiffs contend, challenged school districts are disproportionately populated by minority students. Plaintiffs also object to the manner in which community schools are funded. In contrast to public schools, community schools are almost wholly state-funded and receive no funding from local sources. Plaintiffs allege that this is unconstitutional because the state grants community schools more money per pupil than it grants to traditional public schools.

## A.    Related State Court Litigation

This case is one of at least three that have challenged the constitutionality of the OCSA. In May of 2001, various plaintiffs filed two actions in Franklin County state court challenging the OCSA under the Ohio Constitution.[1] The plaintiffs in each action were represented by, among others, David Latanick, an attorney retained by the Ohio Education Association ("OEA"). In June of 2004, Plaintiffs, also represented by Latanick, among others, filed the present action, challenging the OCSA under the U.S. Constitution. After the Ohio Supreme Court upheld the OCSA under the Ohio Constitution,[2] the state plaintiffs voluntarily dismissed the two state actions on December 13, 2006 and March 2, 2007. On March 23, 2007, another group of plaintiffs, also represented by Latanick, filed a third state action attacking the OCSA.

---

[1] *See Ohio Congress of Parents & Teachers v. Ohio State Bd. of Educ.*, No. 01 CV 4457 (filed May 15, 2001); *Pate v. Ohio State Bd. of Educ.*, No. 01 CV 4414 (filed May 11, 2001).

[2] *See State ex rel. Ohio Congress of Parents & Teachers v. Ohio State Bd. of Educ.*, 857 N.E.2d 1148 (Ohio 2005).

According to proposed Intervenors, shortly after filing the third state lawsuit, *Hinton v. Ohio State Board of Education*, attorneys for the OEA began negotiations with then-Ohio Attorney General Marc Dann in an effort to settle both *Hinton* and the present federal litigation. Proposed Intervenors claim that in early September of 2007, the OEA agreed to dismiss *Hinton*, and likely dismiss the present case, if the Attorney General would agree to pursue litigation to close certain "underperforming and poorly managed community schools," which the parties defined as community schools that:

> Are ranked in academic emergency or academic watch on Local Report Cards for two of the last three reported school years and whose Performance Index Scores on the most recent Local Report Cards are less than that of the school districts from which they draw the largest number of students. – OR – Have been reported by their sponsors to the Ohio Department of Education as being in non-compliance with their academic assessments and accountability plans or their finance plans as set forth in their contracts. – OR – Have been found by the Auditor of State to have unauditable records in the fiscal year most recently the subject of an audit. – OR – Have bad findings for recovery issued against them by the Auditor of State in two or more of the three most recently reported fiscal years covered by regular audits. – OR – Have failed to correct findings issued by the Auditor of State for two or more of the most recent fiscal years covered by regular audits.

It appears from the record that proposed Intervenor HOPE Northwest was identified by the parties to the settlement as a school that is "ripe for closing" under these guidelines.

Pursuant to the settlement agreement, the *Hinton* plaintiffs voluntarily dismissed their state action on September 14, 2007. That same day, Plaintiffs moved to stay the present federal case to permit settlement negotiations. For his part, Attorney General Dann commenced litigation against community schools that the Attorney General deemed to be failing and, despite public controversy, Dann's successors, then-interim Attorney General Nancy Rogers and then-Attorney General Richard Cordray, continued to support the litigation against "underperforming and poorly managed community schools."

**B.**        **Pending Federal Litigation**

The present federal litigation commenced on June 9, 2004. At that time, plaintiff education association members and parents of school-aged children in Ohio filed a Complaint in the district court pursuant to 42 U.S.C. § 1983 against the Ohio Department of Education, the Ohio Board of Education, and Ohio Superintendent of Public Instruction Susan Tave Zelman, challenging OCSA under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution. Defendants moved to dismiss on June 30, 2005. Plaintiffs thereafter voluntarily dismissed all defendants except Zelman on August 11, 2005,[3] and filed an Amended Complaint on October 6, 2005. In a decision not issued until September 20, 2007, the district court denied the motion to dismiss as to all but one claim, which alleged a denial of the right to vote because the OSCA does not permit citizens to determine the "number or members and the organization of a public school board of education . . . within a city, as guaranteed by the Ohio Constitution."

On October 1, 2004, during the pendency of the motion to dismiss, White Hat Management, LLC ("White Hat"), a firm that "provides a full spectrum of services, from management to financial and curriculum assistance, for many community schools," sought intervention as a matter of right and of discretion. (White Hat Mot. at 1, 3.) The district court denied White Hat's application on September 26, 2005, reasoning that as to intervention of right, White Hat had not demonstrated that the parties would not adequately represent White Hat's interests in this litigation. The court further held that permissive intervention was inappropriate because it would cause "undue and unnecessary delay" in the form of the duplication and expansion of the litigation, thus "requir[ing] the Plaintiffs and the Court to invest a significant amount of time and effort in response." White Hat appealed.

On September 5, 2006, this Court affirmed the denial of White Hat's application to intervene. *See Blount-Hill v. State of Ohio*, 195 F. App'x 482, 487. As to

---

[3]For this reason, we use "Defendant" to refer to Zelman, and "Defendants" to refer collectively to the original defendants in this action.

intervention of right, we affirmed on the alternative grounds that White Hat's economic interest in the continuation of its contracts with community schools was "insufficient to comprise a substantial legal interest for purposes of Rule 24(a) intervention." *Id.* at 485. This was because White Hat's interest did "not concern the constitutional and statutory violations allegation in the litigation, but rather an interest in the economic component." *Id.* at 488 (internal quotation marks and citations omitted). With regard to permissive intervention*,* we held that the district court did not abuse its discretion in finding that intervention would cause undue delay. The Supreme Court thereafter denied White Hat's petition for a writ of certiorari.

On September 20, 2007, upon Plaintiffs' application, the district court stayed the instant proceedings to permit settlement negotiations. The parties failed to settle, and on June 30, 2008, Plaintiffs filed a Third Amended Complaint, which added two additional plaintiffs, substituted one existing plaintiff, and revised and expanded certain factual allegations, but did not significantly amend Plaintiffs' legal claims. Defendant filed a second motion to dismiss on August 29, 2008.

On November 21, 2008, during the pendency of this second motion to dismiss, proposed Intervenors sought to intervene as a matter of right and permissively, and alternatively sought to appear as *amici curiae*. On March 30, 2009, the district court dismissed the Third Amended Complaint except as to one claim, which alleged intentional discrimination in the allocation of school funding, in violation of the Equal Protection Clause.

On July 30, 2009, the district court denied proposed Intervenors' application to intervene, reasoning that as to intervention of right, proposed Intervenors failed to show inadequate representation by Defendant; and as to permissive intervention, undue delay and prejudice would result to the existing parties. The district court also permitted proposed Intervenors to appear as *amici curiae*. Proposed Intervenors then appealed.

## DISCUSSION

## I.    INTERVENTION OF RIGHT UNDER RULE 24(a)

### A.    Standard of Review

In this appeal, our review of the required elements of intervention of right under Rule 24(a) is *de novo*. *See United States v. Tennessee*, 260 F.3d 587, 591 (6th Cir. 2001). Although our consideration of the timeliness of an application to intervene is ordinarily tempered by deference to the district court, we have consistently applied a *de novo* standard to the issue where, as here, the district court failed to make any factual findings in this regard. *See Johnson v. City of Memphis*, 73 F. App'x 123, 131 (6th Cir. 2003); *Stupak-Thrall v. Glickman*, 226 F.3d 467, 472 n.5 (6th Cir. 2000).

Intervention of right is governed by Rule 24(a) of the Federal Rules of Civil Procedure. Under the Rule, the "court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposition of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2).

This Court has interpreted the language of the Rule to require an applicant to show that: 1) the application was timely filed; 2) the applicant possesses a substantial legal interest in the case; 3) the applicant's ability to protect its interest will be impaired without intervention; and 4) the existing parties will not adequately represent the applicant's interest. *Grutter v. Bollinger*, 188 F.3d 394, 397-98 (6th Cir. 1999). Each of these elements is mandatory, and therefore failure to satisfy any one of the elements will defeat intervention under the Rule. *See United States v. Michigan*, 424 F.3d 438, 443 (6th Cir. 2005) (citing *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir. 1989)).

### B.          Decision of the District Court

The district court in this case denied proposed Intervenors' application to intervene of right on the basis that they "failed to demonstrate that the present parties may not adequately represent their interests." The district court reasoned that neither case law nor the underlying facts support proposed Intervenors' argument that the Attorney General's "entry into a proposed settlement agreement . . . or his participation in unrelated lawsuits somehow diminishes his interest in defending the validity of Ohio laws." In light of its holding, the district found it "unnecessary" to consider the remaining requirements of Rule 24(a), and indeed expressly stated that it did not reach the issue of timeliness.

On appeal, proposed Intervenors ask this Court to reverse the finding below that they failed to show inadequate representation, and to find that their intervention would otherwise satisfy Rule 24(a). Defendant Zelman argues, as she did below, that the application to intervene is untimely. Defendant would have us affirm on the basis of timeliness, which was the primary basis upon which Defendant opposed the application in the district court.

Having reviewed the record, we agree with Defendant that the untimeliness of proposed Intervenors' application is "glaring," and will thus affirm on this independent basis without reaching the question of inadequate representation. *See Blount-Hill*, 195 F. App'x at 487 (affirming denial of intervention of right on an alternative basis not considered by the district court); *Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002) ("[W]e are free to affirm the judgment on any basis supported by the record."); *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002) (noting that "[b]ecause this [C]ourt's *de novo* review involves only application of legal propositions to the undisputed facts in the record, we may affirm on any grounds supported by the record even if different from the reasons [stated below]").

Despite the district court's failure to reach the issue, our consideration of timeliness in the first instance is consistent with the Supreme Court's admonition that the "court where the action is pending must *first* be satisfied as to timeliness" under Rule

24. *NAACP v. New York*, 413 U.S. 345, 365 (1973) (emphasis added); *see also United States v. Ritchie Special Credit Invs., Ltd.*, 620 F.3d 824, 832 (8th Cir. 2010) ("[T]he timeliness of a motion to intervene is a threshold issue.").

Additionally, we note that affirming on this alternative basis furthers the interests of judicial economy and does not unfairly prejudice the parties, as the issue has been raised and fully briefed. *See Lindsay v. Yates*, 498 F.3d 434, 440-41 (6th Cir. 2007) (reaching an issue not decided below, where the issue was fully briefed and its resolution would serve the interest of judicial economy). Moreover, our consideration of the timeliness of the application will not result in an unnecessary discussion of an unsettled area of law. *Cf. Blount-Hill*, 195 F. App'x at 487 (Clay, J., concurring) (preferring to consider the issue decided below because affirming on an alterative basis would require consideration of "a complex question of first impression").

### C.     Proposed Interventors' Application was Untimely

We begin with the legal standard under which we find the application to intervene to be untimely. In determining the timeliness of an application for intervention of right, we consider five factors:

> 1) the point to which the suit has progressed; 2) the purpose for which intervention is sought; 3) the length of time preceding the application during which the proposed  intervenors knew or should have known of their interest in the case; 4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and 5) the existence of unusual circumstances militating against or in favor of intervention.

*Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990); *see also Clean Up Co., LLC v. ADA Assistance Corp.*, 229 F.3d 1151 (6th Cir. 2000) (table). No one factor is dispositive, but rather the "determination of whether a motion to intervene is timely should be evaluated in the context of all relevant circumstances." *Glickman*, 226 F.3d at 472-73.

Applying these principles to the present case, we begin with the point to which this action has progressed. Proposed Intervenors argue that their motion is timely because the circumstances are similar to those that surrounded White Hat's motion to intervene, which the district court found to be timely. In support of their contention, proposed Intervenors assert that their application was filed less than five months after the filing of the Third Amended Complaint. At that time, the motion to dismiss was not fully briefed, and discovery had not yet closed.

We reject proposed Intervenors' analogy to White Hat's motion to intervene that the district court determined to be timely and find proposed Intervenors' discussion of the record to be unpersuasive. The timeliness of White Hat's application was not an issue disputed by the parties at that time. Moreover, in the three years between the respective applications filed by White Hat and proposed Intervenors, extensive progress has been made in this litigation, including the 1) decision granting in part Defendants' first motion to dismiss; 2) completion of a pretrial conference and issuance of a scheduling order; 3) additional discovery and discussions about stipulations of fact; 4) filing of a Third Amended Complaint; and 5) filing of a second motion to dismiss, to which Plaintiffs responded. These events, coupled with the passage of time, weigh against proposed Intervenors. *See Johnson*, 73 F. App'x at 132 (finding that "extensive progress in the district court before the proposed intervenors filed their motion to intervene" counsels against intervention); *accord Ritchie Special Credit Invs.*, 620 F.3d at 832-33 (denying intervention where "the progress of the litigation [was] substantial.").

The second factor requires us to consider the purpose for which intervention is sought. Proposed Intervenor HOPE Northwest seeks to protect its existence. The individual proposed Intervenors likewise seek to protect their "children's property interest in their education, and HOPE Northwest's ability to provide alternative education in a 'Big 8' district." They explain that "[i]f the current community school funding method is declared unconstitutional and the injunctive relief requested by Plaintiffs is granted, HOPE Northwest would lose its only source of funding[, meaning that proposed Intervenors] and their children would lose their only economically viable

alternative to the failing and dangerous public schools the children would be forced to attend." (Pet'r Br. at 14.) Although many of Plaintiffs' claims have been dismissed, Plaintiffs' success in this litigation may result in the cessation of funding to proposed Intervenor HOPE Northwest. As a result, proposed Intervenors' purpose for intervention may weigh in their favor if their allegations are considered in the light most favorable to them.

Turning to the third factor, we are troubled by the length of time preceding the application to intervene during which proposed Intervenors knew or should have known of their interest in this case. Proposed Intervenors contend that "the most significant event that prompted" their intervention did not occur until Election Day on November 4, 2008. It was with the election of Richard Cordray as Attorney General that proposed Intervenors claim that they "became certain that the plan to shut down HOPE Northwest would be continued" based on Cordray's public announcement that he would continue his predecessors' litigation targeting community schools for closure. Proposed intervenors filed their motion to intervene 17 days after Election Day.

The problem with proposed Intervenors' argument is that it concedes prior knowledge of the Attorney General's agreement to target certain schools, including proposed Intervenor HOPE Northwest. Instead of seeking to intervene promptly after discovering their interest in the litigation, as Rule 24(a)(2) requires, proposed Intervenors by their own admission did not act, but instead waited for the results of the 2008 Election. Such conduct plainly makes their motion untimely. *See Tennessee*, 260 F.3d at 594 (citing *Stotts v. Memphis Fire Dep't*, 679 F.2d 579, 584 & n.3 (6th Cir. 1982) (opining that the applicants "'should have attempted to intervene when they first became aware of the action, rather than adopting a 'wait-and-see' approach'")).

Proposed Intervenors' alternative argument as to their awareness of their interest in this litigation is equally unpersuasive. Proposed Intervenors argue that their motion was timely because they "did not know the contents of the Third Amended Complaint before it was filed" on June 30, 2008. Even if this argument is literally correct, the Third Amended Complaint contains legal claims materially identical to those previously pled.

The amended pleading merely modified the named plaintiffs and expanded certain factual allegations. To the extent their argument has any merit, proposed Intervenors nonetheless waited to intervene until five months after the filing of the amended pleading. *Cf. Johnson*, 73 F. App'x at 133 (finding a motion to intervene untimely, where it was filed seven months after the applicant had notice of its interest).

Furthermore, the motion to intervene filed by White Hat suggests that proposed Intervenors have had actual or constructive knowledge of their interests in this litigation for several years. As Plaintiffs explain, and proposed Intervenors do not deny, White Hat manages and operates proposed Intervenor HOPE Northwest. Although White Hat and HOPE Northwest are separate entities, Plaintiffs assert that White Hat was founded by David Brennan, the same individual who also founded the law firm that represents proposed Intervenors. Combined with the controversial and public nature of the litigation over community schools in Ohio, these facts suggest that proposed Intervenors were on notice of their interest in this litigation as early as October of 2004, around the time of White Hat's motion to intervene. *See Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 182 (2d Cir. 2001). Accordingly, we find that proposed Intervenors' failed to act promptly despite actual or constructive knowledge of their interest in this litigation, and that this failure weighs heavily against the timeliness of their application to intervene.

We now consider any prejudice to the original parties by permitting intervention, and agree with Plaintiffs that intervention at this late stage in the litigation "would only serve to delay the litigation and require a duplication of effort, especially since Plaintiffs have already survived two such motions." If permitted to intervene, proposed Intervenors plan to seek dismissal of the remaining claim based on standing and failure to state a claim. In view of the extensive litigation that has occurred in this case, including two motions to dismiss, numerous amended pleadings, and the denial and appeal of a motion to intervene, intervention at this late stage would cause prejudice in

the form of undue delay.[4] Plaintiffs, Defendant, and the public have an interest in the expeditious and efficient disposition of this action, among other reasons, because of the cost and burden of the litigation on the parties and because it seeks to invalidate a significant state statutory scheme.

The proposed intervention would result in the filing of a *third* motion to dismiss, which would delay this action further by requiring a new briefing schedule and time for the district court to consider the motion. The district court found these same concerns to weigh against White Hat's much earlier application. (*See* Dist. Ct. Docket No. 40 at 9.) Although proposed Intervenors claim they would agree to be bound by the existing discovery schedule, discovery disputes and delays would nonetheless occur if, for example, proposed Intervenors fail to agree to certain stipulations of fact, or any of the parties seek additional discovery in aid of the contemplated third motion to dismiss. Given the history of this case, additional delays would appear to be inevitable. In light of the extensive litigation that has already occurred, and the previous delay caused by an unsuccessful application to intervene that came before this Court, we see no reason to further delay this litigation. *See, e.g.*, *Bailey v. White*, 320 F. App'x 364, 366 (6th Cir. 2009).

---

[4] The dissent argues that prior delays in this litigation justify permitting future delays. This amounts to an argument that past dilatoriness justifies future dilatoriness. Not surprisingly, the dissent fails to offer any legal authority to support such a baffling argument. Instead of supporting intervention, the numerous prior delays that have plagued this litigation support our decision to bring the matter to a close. Indeed, the timeliness requirement serves to prevent cases like this from percolating unresolved on the federal dockets. *See United States v. BASF-Inmont Corp.*, 52 F.3d 326 (6th Cir. 1995) (per curiam) (table) ("[T]he purpose of the timeliness inquiry is to prevent "a tardy intervenor from derailing a lawsuit within sight of the terminal.") (internal quotation marks and citation omitted).

Although the dissent purports to believe that the parties have not engaged in extensive litigation, as evidenced by a claimed lack of discovery, a review of the district court docket reveals otherwise: the parties have been engaged in intermittent discovery since as early September 29, 2004, when the parties filed their initial Rule 26(f) Report. The district court docket also makes reference to a Rule 30(b)(6) deposition and document discovery. To be sure, the scope and nature of discovery may have changed with each amended Complaint, of which there have been three, but the litigation has nonetheless moved forward since its inception more than a half of a decade ago. A bench trial was originally scheduled for August 7, 2006, but was adjourned to allow for dispositive motions and White Hat's motion to intervene. To the extent the dissent faults the parties for not taking more discovery, the dissent's concern is misplaced. Our inquiry focuses on whether the parties have had ample time and opportunity to conduct discovery, not on how much discovery the parties have actually conducted.

**D.        Summary**

For these reasons, and upon a *de novo* weighing of the relevant factors, we are convinced that proposed Intervenors' application was not timely filed.  *See Glickman*, 226 F.3d at 472-73 ("The determination of whether a motion to intervene is timely should be evaluated in the context of all relevant circumstances.") (internal quotations and citation omitted).  Because the timely filing of an application to intervene of right is a requirement under Rule 24(a), proposed Intervenors are not entitled to intervene of right and the decision of the district court is affirmed on this basis.

**II.        PERMISSIVE INTERVENTION UNDER RULE 24(b)**

This Court reviews a district court's denial of permissive intervention for "clear abuse of discretion."  *Purnell v. City of Akron*, 925 F.2d 941, 951 (6th Cir. 1991).  Rule 24(b) provides that, "[o]n *timely motion*, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B) (emphasis added).  In the instant case, because we find that proposed Intervenors' application was untimely—and would thus cause undue delay and prejudice to the existing parties as discussed above—the district court did not abuse its discretion in denying their application for permissive intervention.  Although we hold that proposed Intervenors may not participate as parties in this litigation, proposed Intervenors are not without a voice—the district court previously permitted proposed Intervenors to appear as *amici curiae* in a decision that is not before this Court.

**CONCLUSION**

For the reasons set forth above, we **AFFIRM** the denial of proposed Intervenors' application to intervene under both Rule 24(a) and Rule 24(b) of the Federal Rules of Civil Procedure.

————————————

## DISSENT

————————————

KETHLEDGE, Circuit Judge, dissenting.  The parties to this case have sought and received so many extensions of time that the case remains mired in the pleadings stage nearly seven years after the suit was commenced.  That must be nearly a record. These same parties now tell us that the proposed intervenors should be kept out of the case, notwithstanding their vital interest in its outcome.  The reason, the parties say, is that the intervenors would slow down the parties' expeditious litigation of the case.  That argument, from these parties, should not be taken seriously.

Up first, however, is the question whether the State can credibly represent the intervenors' interests in this case.  The intervenors are parents whose children attend HOPE Academy—a charter school in Cleveland—and the school itself.  They seek to prevent the closure of their school.  Closing the school, however, is exactly what the State (through its assistant attorney general) offered to do as a means of settling a related case.  The lawyers who discussed that offer in the related case are the same lawyers that represent the State and the plaintiffs, respectively, in this case.  So one can hardly blame the parents or the school for thinking that they need to look out for their own interests here.

The State responds that it has defended its charter-school law generally in this case, which means that the State has defended the HOPE school along with all the others.  That is true enough.  But the case is still in its early stages; and, for the reasons already stated, the parents have good reason to think that, if the going gets heavy later on, their school will be among the first tossed overboard.  The parents and school have easily made the "minimal" showing of inadequacy required by Rule 24(a).  *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972).

Our court turns them away nonetheless, on the ground of timeliness:  it says the parents took too long to file their motion to intervene.  On that point, however, some context is in order.  In seven years of litigation, this case has not even moved past the

motion-to-dismiss stage.  Timeliness, in this case, has been an interest honored only in the breach.  And yet we turn these parents away on that ground.  For them that must be a bitter irony.

The court says it is too late for intervention because the parties' litigation of the case has been "extensive."  I do not agree.  As of the filing of the intervenors' motion—and I think as of now too—the parties had conducted virtually no discovery in the case, including, apparently, not a single deposition.  (The parties' most recent Rule 26(f) plan states that "[d]iscovery will commence on 11-17-08 for any issues not agreed to by stipulation."  The intervenors filed their motion four days later, on November 21, 2008.)  Nor has anyone filed a motion for summary judgment yet, because no one will be in a position to do so for months, if not years.  Trial is an even more remote prospect. The only terminal in sight for this case is the one it started from.

The only thing that *has* been extensive in the litigation of this case, so far, is the parties' motions for extensions of time.  The parties have filed (and the district court has granted) no less than 15 of these motions, one of which pushed back the case deadlines by a full seven months.  (No wonder, then, that the district court did not cite timeliness as the basis for its decision.)  If timeliness is the concern, a much more effective way to meet it, with less collateral damage to the parents' interests, would be simply to tell everyone that there will be no more extensions.

Nor do I see any other prejudice resulting from the parents' delay in seeking intervention.  There is certainly no prejudice with regard to the parties' discovery plan, since the intervenors have said they will abide by it.  Nor does the prospect of "discovery disputes" down the road count as prejudice, since those disputes would be the result of intervention *simpliciter*, rather than of any *delay* in intervention.  *See Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990).  Nor should we deny intervention for fear that the parents might file their own motion to dismiss, since the intervention order itself could bar the parents from doing so.  *See Trbovich*, 404 U.S. at 537 & n.8.  To go further, and bar these parents from the case altogether, strikes me as more punitive than

practical.  And Rule 24(a) is not supposed to be a punitive rule.  *See, e.g.*, *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994).

Intervening in a lawsuit in which one is vitally interested should not be akin to cracking a high-school clique.  I think we do the parents and school an injustice, and invert the hierarchy of interests fairly at issue, when we refuse to allow the intervenors to defend their own interests in this case.  I respectfully dissent.