*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0099p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                              *Plaintiff-Appellee*,

                    *v.*                                    Nos. 11-2517/2569

CITY OF DETROIT; DETROIT WATER AND
SEWERAGE DEPARTMENT, et al.,
                              *Defendants-Appellees*,

MICHIGAN AFSCME COUNCIL 25 (AFL-
CIO), (11-2517); AMERICAN FEDERATION OF
STATE, COUNTY & MUNICIPAL EMPLOYEES
(AFSCME) LOCAL 207 and SENIOR
ACCOUNTANTS, ANALYSTS AND APPRAISERS
ASSOCIATION (SAAA), (11-2569),
                              *Intervenors-Appellants*.

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:77-cv-71100—Sean F. Cox, District Judge.

Argued: October 9, 2012

Decided and Filed: April 8, 2013

Before: BOGGS and CLAY, Circuit Judges; and STAFFORD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Herbert A. Sanders, THE SANDERS LAW FIRM, Detroit, Michigan, for
Appellant in 11-2517. George B. Washington, SCHEFF, WASHINGTON & DRIVER,
P.C., Detroit, Michigan, for Appellants in 11-2569. Robert J. Franzinger, DYKEMA
GOSSETT PLLC, Detroit, Michigan, for Appellees City of Detroit in 11-2517 and 11-
2569. **ON BRIEF:** Herbert A. Sanders, THE SANDERS LAW FIRM, Detroit,
Michigan, for Appellant in 11-2517. George B. Washington, SCHEFF, WASHINGTON

_____

[*]The Honorable William H. Stafford, United States District Judge for the Northern District of
Florida, sitting by designation.

& DRIVER, P.C., Detroit, Michigan, for Appellants in 11-2569.  Robert J. Franzinger, DYKEMA GOSSETT PLLC, Detroit, Michigan, Jill M. Wheaton, DYKEMA GOSSETT PLLC, Ann Arbor, Michigan, for Appellee City of Detroit in 11-2517 and 11-2569, R. Craig Hupp, BODMAN PLC, Detroit, Michigan, for Appellee Macomb County in 11-2569.

BOGGS, J., delivered the opinion of the court, in which STAFFORD, D. J., joined.  CLAY, J. (pp. 14-39), delivered a separate dissenting opinion.

---

**OPINION**

---

BOGGS, Circuit Judge.   This case arises out of a long-standing federal environmental compliance action against the Detroit Water and Sewerage Department ("DWSD"), which for over 30 years has been unable to achieve sustained compliance with the Clean Water Act and state environmental laws.  In the most recent round of violations and court orders, a federal district judge in the Eastern District of Michigan attempted to begin a final resolution of the chronic problems in the DWSD.  On September 9, 2011, the judge gave a committee of local officials 60 days to come up with a final plan—or else face a more intrusive court-ordered remedy.  On November 4, 2011, he adopted most of the committee's recommendations but took the additional step of directly abrogating some provisions in the collective bargaining agreements (CBAs) of approximately twenty different bargaining units.  None of the DWSD unions were parties in the case.  Within two weeks, the Michigan American Federation of State, County, and Municipal Employees (AFSCME) Council 25 filed a motion to intervene to challenge the order, which the district court denied as untimely.  Subsequent motions by four more unions were also denied.

Although the Unions were aware of the potential significance of the proceedings and failed to intervene before the court-approved committee returned its recommendations, total denial of intervention was an abuse of discretion.  The Unions have substantial interests at stake that "may as a practical matter" be impaired absent intervention.  Fed. R. Civ. P. 24(a)(2).  While concerns of delay and re-litigation are

serious, they can be alleviated by limiting the scope of intervention instead of outright denial. Therefore, we reverse the decision of the district court, with orders to limit the scope of intervention on remand.

## I

In 1977, the Environmental Protection Agency initiated this federal action against the State of Michigan, City of Detroit (the "City"), and the DWSD for exceeding effluent limitations and failing to satisfy monitoring requirements, in violation of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* The DWSD is a City agency responsible for wastewater collection, treatment, and disposal services and water service to millions of residents in both Detroit and in various suburban communities. Employees of the DWSD currently number nearly two thousand, and are represented by twenty different City-wide bargaining units, most of which include many non-DWSD employees.

Later in 1977, District Judge Feikens entered an initial Consent Judgment, which instituted a plan to deal with various staffing, equipment, and procurement issues. Over the course of the next thirty years, the DWSD fell in and out of compliance with the Clean Water Act and its state permits, requiring multiple amended consent judgments, the commissioning of numerous investigative reports, and appointment of Special Administrators with broad powers to bypass constraints on the City government—including the ability to override the City Council and to "revisit existing union contracts and civil service rules." The consent judgments and reports were consistent in identifying a host of problems that plagued the DWSD to the core, including technical, managerial, institutional, and organizational issues. From the start, human resources issues were prominent among the identified problems. In 1978, court-appointed monitor Dr. Jonathan Bulkley found "chronic and severe understaffing" of qualified skilled personnel at the DWSD: *less than half* of skilled positions were filled, but staff in entry-level positions had bloated to quadruple the budgeted amount. Even after the plant was brought into compliance by the actions of the first Special Administrator, the problems remained: a 1994 DWSD report identified several festering staffing problems, including inflexible City-wide policies, outdated job descriptions, and

"no method to evaluate employees for performance or advancement potential." After a relapse in 1997, a committee tasked by Judge Feikens issued a report in 2000, finding similar problems to those identified before, including, again, chronic understaffing, inadequate training, outdated job descriptions, and promotion policies that made competitive hiring "difficult, if not impossible." Although the technical causes of non-compliance were subsequently resolved in large part, a consultant hired by the City warned in 2007 that "issues that are more people and organizationally related [] could possibly jeopardize sustained compliance." As anticipated, the DWSD again fell out of compliance in 2009, and the court called upon Dr. Bulkley for a second investigative report. Sounding a more urgent note, his report noted "striking similarity" to earlier problems and recommended that "[i]t may be appropriate to consider more fundamental corrective measures to address the institutional problems."

Judge Cox was reassigned the case in late 2010 upon the retirement of Judge Feikens. On February 11, 2011, Judge Cox entered a stipulated order reorganizing the Board of Water Commissioners to ensure greater expertise and autonomy. In the order, Judge Cox invited any of the parties to file a motion to dismiss within 6 months if "substantial compliance" with state permits and prior consent judgments could be shown. In the meantime, the DWSD had been dealing with state regulators concerning its 2009 and 2010 permit violations. On August 31, 2010, the DWSD had developed a "Corrective Action Plan" at the request of state regulators. In general and aspirational terms, the DWSD set goals of re-engineering and reducing delay in the staffing process, revising and realigning its organizational structure and role definitions, and ensuring adequate skilled staff—including, "[i]n collaboration with its union constituents," identifying tasks to be performed by subcontractors. Unable to meet the goals of the Corrective Action Plan, the DWSD entered into an Administrative Consent Order with state regulators effective July 21, 2011.

Armed with the Administrative Consent Order, the DWSD filed a motion to dismiss the federal action, arguing that the Second Amended Consent Judgment was outdated and that state supervision and the new Administrative Consent Order would be

sufficient and more appropriate to bring the DWSD into compliance. Two suburban counties—Oakland and Macomb—objected, both calling for further empowerment of the Board of Water Commissioners, as the "Executive Branch of the City has failed to do what it takes" despite being "given multiple opportunities and extraordinary powers." In the statements of facts in their responses to the City's motion to dismiss, the counties elaborated on the long-standing human resources problems facing the DWSD, noting the problem with City-wide "bumping rights," compensation restricted by CBA and City policy, delays in hiring, and lack of effective upper-level management. Both counties called for injunctive and other relief specifically targeting union practices.

Judge Cox rejected the DWSD's arguments in a September 9, 2011, order ("September 9 Order"), finding the DWSD unable to achieve even *short-term* compliance with the consent order. He again emphasized the root causes "consistently" found by the numerous reports issued over the years, including lack of qualified personnel, hiring delays, insufficient training, obsolete job descriptions, required use of the City HR department, and restrictive City personnel, civil service, and union rules. Judge Cox emphasized that "human resources issues have been a chronic problem for the DWSD for the past 34 years."

With respect to diagnosing the problem, Judge Cox's order did not break any new ground. However, in addressing remedies, he heeded the call of the 2010 Bulkley Report and the suburban counties, concluding that "in order to achieve *long-term* compliance with the Clean Water Act, other less intrusive measures, over many years and many attempts, having proved unsuccessful, more fundamental and intrusive corrective measures are required." Giving local officials one last chance, Judge Cox tasked a committee of City and DWSD leadership ("Root Cause Committee") to propose a plan for long-term compliance within 60 days. In formulating its recommendations, the Committee was to be unconstrained by "any local Charter or ordinance provisions or by the provisions of any existing contracts." Judge Cox noted that any effective remedy to achieve sustained compliance would require the court to order "structural changes . . . *that will likely override* the City of Detroit's Charter, its local ordinances,

and/or *some existing contracts*." (emphasis added). If the Committee failed, Judge Cox indicated he would take matters into his own hands by means of an unspecified "more intrusive remedy."

News media were quick to understand and report the implications of Judge Cox's decision. Articles appeared on the front pages of the *Detroit Free Press* and the *Detroit News*, explaining that Judge Cox had "ordered city officials Friday to disregard union contracts, local ordinances and even the city charter." The Unions likewise expressed their disapproval, with Local 207 president John Riehl quoted on the day of the order accusing Judge Cox of "suggesting that some type of dictatorship can solve this" and a few days later vowing to "file for intervenor status in federal court." (App'x to Br. of Appellee Macomb County Exs. 14, 16.)

During the 60-day period, the Root Cause Committee reviewed all of the historical reports concerning the DWSD and consulted a broad range of stakeholders, including union representatives, DWSD management, industry professionals, and DWSD vendors.[1] The Committee acted within the 60-day period and returned its findings on November 2, 2011, calling for changes in procurement, management, organization, and, most relevant to this appeal, a range of human resources policies governed by CBAs. The Committee, however, was unable to come to an agreement as to how issues with union work rules should be addressed. Two days later, Judge Cox adopted most of the recommendations of the Committee and issued the most aggressive remedial order to date. He affirmed the Committee's recommendation that the DWSD establish an administrative structure autonomous from the city and disregard the requirements of the City's procurement policy. Further, he ordered striking any offending provisions of the CBAs, including City-wide bargaining, bumping, seniority, limits on subcontracting or outsourcing, job descriptions, non-merit-based promotion, and overtime. Judge Cox even enjoined "the Wayne County Circuit Court and the Michigan Employment Relations Commission from exercising jurisdiction over disputes

---

[1]The Unions admit that their representatives met with the Root Cause Committee, but contend that they were not told about the details of the Committee's planned recommendations and therefore were unable give effective input.

arising from the changes ordered by this Court" and also enjoined the Unions—not before the court—from "filing any grievances, unfair labor practices, or arbitration demands." While the order was admittedly more intrusive than any issued before in the case, Judge Cox declined to employ some of the more extreme measures suggested by the Root Cause Committee, including suspension of the City's duty to bargain, reestablishing the DWSD as an independent regional authority, or termination of the entire workforce.

Within ten days, the Michigan AFSCME Council 25 moved to intervene as of right, arguing that the court order violated the Contract, Takings, and Due Process Clauses of the U.S. Constitution, and alleging that the order "does absolutely nothing to stop pollution or enforce the *Clean Water Act*." (italics in original). Due to the health risks of the ongoing violations and fact that he had already issued an injunction to remedy the same, Judge Cox gave expedited consideration to the motion, denying it as untimely four days later. Two weeks later, AFSCME Local 207 and the Senior Accountants, Analysts and Appraisers Association also moved to intervene, arguing that the court exceeded its powers and improperly failed to join the Unions or provide a hearing before issuing its November 4 injunction. Applying the exact same reasoning as before, Judge Cox denied the motion as untimely.

In the orders denying intervention, Judge Cox relied on *Michigan Ass'n for Retarded Citizens v. Smith*, 657 F.2d 102 (6th Cir. 1981), and *Stotts v. Memphis Fire Dep't*, 679 F.2d 579 (6th Cir. 1982), both of which denied intervention to unions that sought to challenge consent decrees after they were entered by the district courts. Applying five timeliness factors from those cases, Judge Cox found that the unions long should have known of their interest at stake, did not have a proper purpose to seek intervention at such a late stage in the litigation, and that further delay would prejudice the health and safety of the population of southeastern Michigan.

The Unions now appeal from the denials of intervention.[2]

---

[2]Appellant AFSCME Council 25 has moved to voluntarily dismiss its appeal, No. 11-2517, with the consent of Defendants-Appellees. Fed. R. App. P. 42(b). We now grant that motion.

## II

Rule 24(a) provides for intervention as of right[3] "[o]n timely motion" to anyone with an unconditional statutory right or who

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a). If the motion is untimely, the court must deny intervention. *Mich. Ass'n for Retarded Citizens*, 657 F.2d at 105. As timeliness is a matter within the sound discretion of the court, the ruling will be reviewed under an abuse of discretion standard. *Ibid*. We will find abuse of discretion only if we are "left with the definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors or where the trial court improperly applies the law or uses an erroneous legal standard." *Coal. to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007). Timeliness is to be determined from all the circumstances, including:

> (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his or her interest in the case; (4) the prejudice to the original parties due to the proposed intervenor's failure, after he or she knew or reasonably should have known of his or her interest in the case, to apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Grubbs v. Norris*, 870 F.2d 343, 345–46 (6th Cir. 1989).

The district court provided substantial grounds for denying intervention. As to the first factor, the district court reasoned that the long history of remedial attempts, court orders, and expert reports makes clear the "extensive progress in this case." Dist.

---

[3]Appellant Local 207 has also moved for permissive intervention under 24(b) in the alternative. Since the issue in this case is timeliness, the analysis is effectively the same for both. *Mich. Ass'n for Retarded Citizens*, 657 F.2d at 105.

Ct. Op. at 18. More narrowly, the Unions waited to intervene until after the completion of the Root Cause Committee report; such delay weighs strongly against re-running that process. As to the second factor, the Unions made no attempt to limit the scope of interventions, evidencing a willingness to challenge core premises of the litigation. *See* AFSCME Motion to Intervene at 4 ("The Court's Order restricts the rights of City employees and City unions, it does absolutely nothing to stop pollution or enforce the *Clean Water Act*.") (italics in original); Br. supporting Local 207 Motion to Intervene at 2 ("[T]he Court's November 4 Order in fact will do nothing to advance the cause of clean water in southeastern Michigan—a fact Local 207 and the SAAA could have made plain . . . ."); Br. of Local 207 at 17 ("The Clean Water Act has never been interpreted as a vehicle for the federal courts to implement their view of proper labor relations . . . ."). The Unions' positions were further weakened by technical deficiencies in their motions, whose failure to conform to Rule 24(c) obscured what relief the Unions were actually seeking. The third factor was particularly important: the Unions were actually and reasonably aware of their threatened interests by the time of the September 9 Order, but opted to "wait and see" what the results of the Root Cause Committee report would be. *Stotts v. Memphis Fire Dep't*, 679 F.2d 579, 584 n.3 (6th Cir. 1982). Finally, the district court was concerned with prejudice to the parties and the general public, as the delay caused by intervention would "present a serious health, safety and environmental risk to the people of Southeastern Michigan." Dist. Ct. Op. at 17.

The facts in this case are not one-sided, however. The mere passage of time—even 30 years—is not particularly important to the progress-in-suit factor. *See Stupak-Thrall v. Glickman*, 226 F.3d 467, 475 (6th Cir. 2000). Instead, the proper focus is on the stage of the proceedings and the nature of the case: this suit has essentially been in a remedial, non-adversary posture from the start, and despite significant progress, cannot be expected to end any time soon. On the second factor, when the deficiencies of the Unions' motions are cleared away, the core of their purpose for intervention is substantial: their collective bargaining rights have been impaired, not just practically, but directly, by the decision of the district court. Where future progress remains and the

intervenor's interests are relevant, intervention may be the most effective way to achieve a full and fair resolution of the case.

The close balance of fact-specific considerations, as well as the complexity of the underlying case, would ordinarily counsel deferring to the district court's discretion to deny intervention. *See, e.g.*, *Stotts*, 679 F.2d 579; *Michigan Ass'n for Retarded Citizens*, 657 F.2d 102. But courts are not faced with an all-or-nothing choice between grant or denial: Rule 24 also provides for limited-in-scope intervention. *See* Fed. R. Civ. P. 24, advisory committee's note, 1966 amendments ("Intervention of right . . . may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings."). Recognizing this, courts often permit intervention even after final judgment, for the limited purpose of appeal, *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977), or to participate in future remedial proceedings, *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 129 (D.C. Cir. 1972). Intervention may also be limited to "claims raised by the original parties," subject to a bar to raising "collateral issues." *Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 737–38 & n.11 (D.C. Cir. 2003) (reversing denial of intervention and remanding to district court with the "option" to limit scope); *see also Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 537 (1972) (permitting intervention limited "to the claims of illegality presented by the Secretary's complaint," but not permitting consideration of two additional grounds for setting aside union election). *See generally* David Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators*, 81 Harv. L. Rev. 721, 727 (1968) ("It is both feasible and desirable to break down the concept of intervention into a number of litigation rights and to conclude that a given person has one or some of these rights but not all.").

Limited intervention is particularly appropriate in fact-specific situations such as this one, where the case is complicated, non-adversarial, and implicates the public interest; getting all interested parties to the table promotes an effective and fair solution, but preventing an expansion of the scope is necessary to keep control of the case. In probably the most analogous case to this one, *Stotts*, Judge Martin made a similar

suggestion in dissent: "Had intervention been granted in this case, limited to a hearing describing and defending alternative promotional plans, the District Court could have resolved the merits of the proposals in short order, with little or no delay." *Stotts v. Memphis Fire Dept.*, 679 F.2d 579, 596 (6th Cir. 1982) (Martin, J., dissenting). Indeed, this very case has seen various forms of limited intervention; both in 1980 when Judge Feikens issued an order to show cause to the Unions why he should not override a decision of a labor arbitrator, and in 2000 when the Army Corps of Engineers was ordered to show cause why it should not accept DWSD sludge. *See United States v. City of Detroit*, 329 F.3d 515 (6th Cir. 2003) (en banc).

On the facts of this case, the district court's legitimate concerns with finality, prejudice, and efficiency could just as well—or better—have been addressed by limiting the scope of intervention. Therefore, the district court abused its discretion in denying intervention outright. The first major concern with intervention in this case is that it could disturb the settled progress in this case. Interested parties should not be able to join at a late stage and re-litigate issues that they watched from the sidelines. But the district court can ensure this without denying intervention: the scope of intervention can be limited on a prospective basis, allowing appeal of recently issued orders and participation in new matters. Such limited intervention would not interfere with the orderly processes of the court, as the Unions sought to intervene before the time for appealing the November 4 Order expired. *See United Airlines, Inc.*, 432 U.S. at 392 ("[The motion to intervene's] purpose was to obtain appellate review . . . and the motion complied with, as it was required to, the time limitation for lodging an appeal prescribed by Fed.Rule App.Proc. 4(a)."). The other major concerns of prejudice and efficiency can also be addressed with proper limitation. The district court can confine the issues the Unions may raise, limiting intervention to matters that are forum-appropriate. *Cf. United States v. Tennessee*, 260 F.3d 587, 593 (6th Cir. 2001) ("[S]hould CMRA hope, through intervention, to obtain higher rates and fewer obligations for community providers, this forum is not the appropriate forum to seek such relief."); *S.H. v. Stickrath*, 251 F.R.D. 293, 302 (S.D. Ohio 2008) (finding that a factor weighed against intervention where state employment-relations board had exclusive jurisdiction over claim of violation of

CBA rights). To the extent the assertion of the Unions' relevant interests may cause delay, such a consideration is not grounds for denial of intervention—the analysis must be limited to the prejudice caused by the *untimeliness*, not the intervention itself. *See Stallworth v. Monsanto Co.*, 558 F.2d 257, 267 (5th Cir. 1977). The district court also failed to consider the potential prejudice resulting from complete denial of intervention: significant delay in resolving important issues could have resulted from collateral challenges to its orders from the Unions—as nonparties, the Unions would ordinarily not be bound by the district court's determinations. *See Martin v. Wilks*, 490 U.S. 755, 762 (1989), *superseded by statute (in the civil rights context)*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074.

Given the district court's greater familiarity with this case and interest in managing its own docket, the district court retains broad discretion in setting the precise scope of intervention. Further argument from the Unions is warranted to make a clearer case as to the exact purposes for which intervention is sought. Nevertheless, the facts on appeal do point to some matters on which, at a bare minimum, the Unions must be permitted to intervene, and others on which intervention is inappropriate. *See Trbovich*, 404 U.S. at 539 (reversing and remanding with an order for limited intervention in accordance with the opinion). The core of the Unions' purpose for intervention must be participation in shaping future remedial efforts and the right to appeal or challenge adverse orders issued within the 30-day period before intervention was sought—specifically the November 4 Order. *See Linton ex rel. Arnold v. Comm'r of Health & Env't, State of Tenn.*, 973 F.2d 1311, 1318 (6th Cir. 1992) ("Since the post-judgment motions to intervene were filed 25 days after the district court entered its final judgment, their applications were made within the 30-day time period prescribed for purposes of filing a notice of appeal."). The district court, however, should be vigilant about attempts to transform this environmental enforcement action into a labor arbitration. The Unions' Contract Clause and Takings arguments are targeted at the City—the district court's order is not subject to the constraints of these clauses—and should be raised in separate suits to the extent justified by actual City actions. Intervention should be limited to preclude attempts to re-litigate settled facts, reports,

and orders.  To the extent the Unions contest the substance of labor issues facing the DWSD, those matters are appropriate for contract negotiations with the City, but the district court should not reopen the evidentiary record and may reasonably rely on past findings to draw its conclusions.

## III

For the foregoing reasons, the judgment of the district court denying intervention is REVERSED and REMANDED for a limited grant of intervention.  Arguments about the procedural and jurisdictional invalidity of the November 4 Order within the scope of intervention, including that there was no hearing in issuing an injunction under Rule 65 and that the court exceeded its powers under the All Writs Act, should be argued below on remand.  This judgment applies to appeal No. 11-2569 only; AFSCME Council 25's motion to voluntarily dismiss is GRANTED and appeal No. 11-2517 is dismissed.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.  I agree that the district court abused its discretion, and accordingly, I would reverse, but because I disagree with the majority's analysis and its instructions to the district court, I do not join the majority opinion.  The district court's decision, though flawed, was limited to the threshold issue of the timeliness of the Unions' intervention.  In contrast, the majority's decision strays far afield from the decision on appeal and instructs the district court as to how to conduct its proceedings with respect to the underlying issues, even though issues pertaining to "limited intervention" were never briefed or argued before this Court.  Even worse, the majority's instructions with respect to its peculiar formulation of "limited intervention" are vague, ambiguous, and ill-advised; indeed, the majority's instructions seem calculated to have the purpose or effect of preventing meaningful participation by the Unions in this litigation.  One is left to wonder whether the unnecessarily limited and circumscribed scope of the intervention permitted by the majority, combined with the lack of clarity of its instructions, might be designed to stifle rather than to permit meaningful participation by the Unions.

None of the existing parties to this case claims that AFSCME Council 25 ("AFSCME"), Local 207, and the Senior Accountants, Analysts and Appraisers Association ("SAAA") (collectively "the Unions")  do not have serious and significant legal interests at stake.  Neither the district court nor the majority makes that claim.  And indeed, the interests of the Unions in safeguarding the contracts that they have negotiated with the City of Detroit, and the rights of their constituent members, are self-evident.  Yet the district court, in a decision that failed to even address all of the factors under the test it purported to apply, unceremoniously refused to allow the Unions the opportunity to be heard, and asserted for itself wide-ranging supervisory powers over the dispute between the City and the EPA, while ignoring the interests of the City's employees.  The majority attempts to resolve this problem by reversing the district court on the issue of

timeliness while limiting the scope of the Unions' intervention. But because the district court decided the motion on the threshold issue of timeliness, there is no record before us on which we can decide the appropriate scope of intervention. Under the circumstances, while the majority claims to be engaged in a narrow and attenuated form of review, it has actually gone well beyond the issues presented to us on appeal.

I would find that the motions to intervene by the Unions were timely, and would reverse and grant a general remand without any further instructions. For the reasons that follow, I would hold that the district court abused its discretion, and that in any event, the district court's order was in violation of Federal Rule of Civil Procedure 19. Therefore, I respectfully dissent.

### A.     Background

The Detroit Water and Sewage Department ("DWSD") is responsible for providing drinking water and for the treatment of wastewater for a large area of Southeastern Michigan,[1] including the entirety of the City of Detroit and many of the city's neighboring municipalities. AFSCME Council 25 is a labor union, which represents various local union affiliates of public employees in Michigan. Council 25 includes over 3,500 members who are employed by the City of Detroit, and subject to collective bargaining agreements ("CBAs") with the city. AFSCME Local 207 ("Local 207") is an affiliate of Council 25, and represents approximately 1,000 operations and maintenance personnel at DWSD. The Senior Accountants, Analysts and Appraisers Association is a labor union representing about 150 employees of the DWSD. The International Union of Operating Engineers Local 324 ("Local 324") is a labor union representing a small number of DWSD employees who perform ancillary support functions for DWSD.

The matter before us concerns environmental litigation that began in 1977. Under the Clean Water Act, 33 U.S.C. 1251 *et seq.*, ("Clean Water Act,") the

---

[1] DWSD's water-service area is over 1,000 square miles, while its waste treatment area is 946 square miles.

Environmental Protection Agency ("EPA") administers the National Pollutant Discharge Elimination System ("NPDES"). Under this system, facilities, such as DWSD's wastewater treatment plant ("WWTP") that discharge pollutants into waterways are required to obtain a permit. *See* Environmental Protection Agency, *National Pollutant Discharge Elimination System*, http://cfpub.epa.gov/npdes/ (last visited March 22, 2013). In 1977, the United States, through the EPA, sued the State of Michigan,[2] the City of Detroit, and the Detroit Water and Sewage Department, alleging violations of the NPDES permit. Of particular relevance to the instant motions was the allegation that DWSD employed an insufficient number of people at the WWTP, and that what staff was employed there was not adequately trained. In September 1977 the U.S. District Court for the Eastern District of Michigan entered a consent judgment, which among other provisions, required that DWSD start a staff training program.

In 1979 the district court appointed the Mayor of the City of Detroit, then Coleman A. Young, as administrator, in response to a request from the EPA. This gave the mayor significant authority over the DWSD. The court also found that DWSD had not, as of March, 1979, implemented the staff training program. In response, DWSD changed several shift schedules at one of its facilities. This action was challenged by Local 207 and an arbitrator agreed with the union. DWSD asked the district court to overrule the arbitrator. In opposing that motion, the Union argued that were the court to overturn the arbitral decision, then it would open itself to many labor disputes based on the collective bargaining agreements. The district court sided with the Union and upheld the arbitrator's decision.

In 1997, the district court appointed a committee to investigate DWSD's renewed non-compliance with the consent judgment. That committee reported, in 2000, that DWSD's noncompliance was caused, at least in part, by "deficiencies in employee training, as well as constraints on hiring, promoting, and job classifications imposed by CBAs." (R. 2397, Opinion and Order, Sept. 9, 2011, at 9.) The City of Detroit then requested that the district court appoint a second special administrator, and the court

---

**2**The State of Michigan was later re-titled as a party plaintiff.

appointed the Mayor of the City of Detroit, then Dennis W. Archer, to the position. The special administrator was permitted to "revisit" some union contracts, "rewrite job descriptions," and "review" civil service rules. One should note, however, in the period from 1979 until 1997, while there were occasional flurries of briefing, the consent decree was otherwise administered by the district court in a slow and routine manner.

In November of 2009, the Michigan Department of Environmental Quality ("DEQ") cited DWSD for permit violations. DEQ sent a second notice in April 2010, stating that the violations were continuing. The district court then ordered the court's monitor, Dr. Jonathan Bulkey, to investigate. In June 2010, he delivered a written report to the court, reiterating that constraints on staffing were among the causes of DWSD's continuing non-compliance. Similarly, a 2010 report from the Engineering Society of Detroit identified human resources as one of the primary areas of concern for DWSD.

In November 2010, after a prolonged health-related absence by Judge John Feikens, who would pass away in May 2011, the case was re-assigned to Judge Sean Cox, ending over thirty years of administration by Judge Feikens. The administration of the case proceeded more or less as it had proceeded for the past thirty years, until the City slipped out of compliance—a rare though not unique occurrence in the course of this litigation.

In February of 2011, the City of Detroit agreed with several defendant counties that granting additional powers to the Board of Water Commissioners ("BOWC") would aid DWSD in achieving compliance. The district court entered a stipulated order memorializing this agreement. In 2011, Mayor of the City of Detroit Dave Bing, appointed a new BOWC, and in July of that year, the BOWC amended its by-laws to reflect the provisions of the stipulated order. Also in July 2011, the City of Detroit, DWSD, and DEQ agreed to an Administrative Consent Order ("ACO") which included provisions regarding staffing at the DWSD. Detroit and the DWSD also filed a motion to dismiss, asserting that the ACO was a better means of achieving compliance than the DEQ action. That motion to dismiss therefore included a proposal to substitute the ACO for the Second Amended Consent Judgment of 2000.

Defendant counties Oakland and Macomb each opposed the motion to dismiss. Both of the counties asserted that DWSD's collective bargaining agreements were an impediment to DWSD's compliance, and asked the district court to permit DWSD to violate the contracts. On September 9, 2011, the district court denied the motion to dismiss, and stated it would likely need to fashion an equitable remedy, which would *"likely override the City of Detroit's Charter, its local ordinances, and/or some existing contracts."* (R. 2397, Opinion and Order, Sept. 9, 2011, at 42 (emphasis in original).) The district court then created a committee, the Root Cause Committee, consisting of local officials and other stakeholders, including some union representatives, to propose a plan to address non-compliance based on the causes identified in the court's order of September 9, 2011. The court specified that the committee's recommendations did not have to be limited by provisions of the Detroit charter, local ordinances, or existing contracts. (*Id.* at 43.)

On November 2, 2011, the Root Cause Committee submitted a proposed plan of action to the Special Master, who submitted it to the district court. On November 4, 2011, the district court issued an order stating that it found the that the plan of action addressed the causes of non-compliance, and adopted the plan, ordering its immediate implementation. Neither the Committee, nor the Special Master, nor the district court published the plan before the court ordered its implementation. The plan did state that changes to the CBAs were necessary for compliance, but the committee could not agree on specific changes. In adopting the plan the district court ordered, on its own initiative, changes to the CBAs. While these changes left the CBAs in place, the order struck and enjoined several provisions, and substituted in the court's preferred terms. On November 14, 2011, AFSCME Local Council 25 filed the instant motion to intervene. The district court denied that motion as untimely on November 18, 2011. The other unions filed their motions to intervene over the next six weeks, and each was denied by the district court. The current appeals followed those denials.

**B.     Rule 24**

I would find that the district court's orders denying intervention constitute an abuse of discretion.  While the district court correctly stated the test for intervention, it did not properly apply the test.  The majority favors a "limited remand" based on an ill-described "limited intervention," but it ignores the fact that the district court's decision was based entirely on timeliness, a threshold issue.  As a result, this Court has no meaningful basis upon which to limit our remand beyond reversing the district court's finding of untimeliness.  Furthermore, it should be noted that nothing in the parties' briefs regarding the district court's decision discusses or addresses the issue of a "limited intervention," a device that comes to us as a sort of *deus ex machina* from the majority's imagination.

> Whether a motion to intervene is timely is analyzed according to five factors:
>
> 1) the point to which the suit has progressed; 2) the purpose for which the intervention is sought; 3) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his interest in the case; 4) the prejudice to the original parties due to the proposed intervenor's failure, after he or she knew or reasonably should have known of his interest in the case, to apply promptly for intervention; and 5) the existence of unusual circumstances militating against or in favor of intervention.

*Jordan v. Michigan Conference of Teamsters Welfare Fund*, 207 F.3d 854, 862 (6th Cir. 2000) (citing *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir.1989)); *see, e.g.*, *Blount-Hill v. Zelman*, 636 F.3d 278, 284 (6th Cir. 2011) (citing *Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990)).  "No one factor alone is dispositive . . . . " *Id.* at 284 (citing *Thrall v. Glickman*, 226 F.3d 467, 472–73)); *Stotts v. Memphis Fire Dep't*, 679 F.2d 579, 582 (6th Cir. 1982) ("Timeliness is to be determined from all the circumstances."); *see also S.H. v. Stickrath*, 251 F.R.D. 293, 297 (S.D. Ohio 2008) ("There is no bright-line rule to determine the timeliness of a motion to intervene.")  The

district court's decisions[3] ignored one of these factors, misapplied three of the other factors, and improperly weighed the five factors as a whole. Accordingly, I would find these decisions constitute an abuse of discretion.

With regard to the first factor, the progress of the case, the district court correctly points out that the litigation has been ongoing for over thirty years. But this factor is less concerned with the total time accrued in the litigation, and more properly directed to the finality of any judgments or orders entered. *See, e.g.*, *Stupak-Thrall v. Glickman*, 226 F.3d 467, 475 (6th Cir. 2000). Further, the order to which the Unions object was issued on November 4, 2011, about two weeks before AFSCME filed its motion to intervene, and the last motion to intervene appealed here was filed within two months of the first order, about six weeks after the first denial of a motion to intervene was issued. Given the complexity of this litigation, that was hardly an unreasonable delay, especially when one considers that the litigation had been almost entirely non-adversarial. *See id.* (finding that the time between the initial complaint and the motion to intervene is irrelevant); *see also, e.g.*, *Blount-Hill,* 636 F.3d at 285 (finding a motion to intervene untimely where there had been a three-year wait before intervention, during which the court granted a partial motion to dismiss, set a schedule, and the parties completed additional discovery and fully briefed a motion to dismiss).

DWSD argues that at least with regard to Council 25 and Local 207, the Unions had been on notice of the possibility of modifications to the CBA by the court since at least 1979, when the Unions successfully opposed such an attempt. But it is unclear why this is evidence of untimeliness, when it could easily be construed as evidence that the Unions have guarded their rights throughout the thirty-year process, or that the Unions did not see a need to intervene. And as the majority notes, there was no expectation, even after the November 9, 2011 order, that federal court supervision of the case would end or that the litigation was complete.

---

[3]The district court entered its order denying AFSCME's motion to intervene on November 18, 2011, and denied Local 207's and the SAAA's motion on December 13, 2011. Except for its analysis of factor two, *see infra*, the decisions were substantively identical.

Furthermore, the underlying litigation has for the most part not been adversarial in nature. Shortly after the initial case was filed, the proceedings shifted from an adversarial posture to a more administrative one. While this does not change the operative legal rules, it should inform our understanding of the case. The rules governing intervention are predicated on assumptions about how parties can best represent their own interests in an adversarial process. Because this litigation has been largely non-adversarial, many of the district court's assumptions regarding the desirability of early intervention are misguided.

The second factor for the inquiry into timeliness is the "purpose for which the intervention is sought." *See, e.g.*, *Michigan Ass'n for Retarded Citizens v. Smith*, 657 F.2d 102, 105 (6th Cir. 1981). In its order denying Council 25's motion to intervene, the district court ruled that "this factor weighs against intervention," because of Council 25's purported failure to comply with the procedural requirements of Federal Rule of Civil Procedure 24(c). (R. 2413, Opinion and Order, Nov. 18, 2011, at 28.) But this Circuit disfavors a technical, narrow, construction of Rule 24's requirements. *See Providence Baptist Church v. Hillandale Comm., Ltd.*, 425 F.3d 309, 314–15 (6th Cir. 2005). As a technical matter, the district court's ruling is simply incorrect. While the district court correctly noted that Rule 24(c) requires that a motion to intervene include a pleading that identifies the basis for intervention, *see* Fed. R. Civ. P. 24(c), and that Rule 7(a) enumerates the only forms of pleading allowed in federal civil action, *see* Fed. R. Civ. P. 7(a), the district court failed to note that Federal Rule of Civil Procedure 8(a)(1)–(3) provides the requirements for a pleading. That rule indicates that:

> A pleading that states a claim for relief must contain: (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. Rule. Civ. P. 8(a)(1)–(3). AFSCME Council 25's motion plainly conformed to the standard found in Rule 8. Moreover, no one has expressed any doubt over the district court's continued jurisdiction over the matter. AFSCME's motion to intervene included

statements of its claim, (*See* R. 2412, Council 25 Motion to Intervene, Nov. 14, 2011, ¶¶ 30–46,) and included a demand for relief sought.[4] (*Id.* at 19–20.) Accordingly, the district court erred in stating that Council 25 had failed to comply with the pleading requirements of Rule 24, and therefore abused its discretion in ruling, without factual or legal support, that this factor favored a finding of untimeliness. Furthermore, even if one assumes that AFSCME failed to comply with the technical requirements of Rule 24, the district court provided no reason for its assertion that this favored a finding of untimeliness, rather than simply constituting a neutral factor.

Local 207 and the SAAA did include an attached pleading. The attached pleading was an answer to the 1977 complaint. Unlike Local 324, which also sought to intervene before settling with the DWSD, Local 207 and the SAAA's pleadings did not include an additional cross-complaint. Accordingly, the district court did not abuse its discretion in finding that with respect to Local 207 and the SAAA, the purpose of intervention, at least as narrowly construed through their pleading, favors a finding of untimeliness. But this factor must still be weighed against the other factors, and take into account the obvious interest that the Unions would have in guarding their contractual rights as defined in the CBA, as well the district court's long history of administering this dispute. Finally, the majority attempts to characterize the Unions' pleadings as a "willingness to challenge core premises of the litigation," perhaps because the Unions argued that the district court's orders did not facilitate compliance with the Clean Water Act. However, this is a very strange reading of the pleadings, and in any event is never explained by the majority with any specificity.

The third factor considered for timeliness is "the length of time preceding the application during which the proposed intervenor knew or reasonably should have

---

[4] Whether a pleading conforms to the standard given in Rule 8 must be analyzed according to the standard set out by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (interpreting *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)). According to *Iqbal*, a pleading is sufficient when it contains "sufficient factual matter, accepted as true," that would "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 677–78 (citing *Twombly*, 550 U.S. at 570, 556). The facts alleged in the November 14, 2011 Motion to Intervene, which largely concern the implementation of the district court's order of November 4, 2011, meet this standard, because, if true, they support a reasonable inference that the City of Detroit and DWSD have impaired Council 25's rights under the CBA.

known of his interest in the case." *See, e.g.*, *Blount-Hill*, 636 F.3d at 283.  Both the district court and Defendant DWSD point to the fact that this litigation has been ongoing since 1977 as evidence of untimeliness.  But it cannot be the case that the Unions' failure, in 1977, to anticipate that the court's interpretation of a decree in 2011 would adversely affect them, governs the timeliness of their motion.  *See, e.g.*, *Doe v. Briley*, 2007 WL 1345386, at *3 (M.D. Tenn. May 7, 2007) (refusing to consider the entry of a consent decree as the final judgment where later events lead to a party's attempt to intervene).  And while the district court cites many examples that show that the Unions knew that the DWSD would need to make changes, none of the prior orders or reports cited suggest that a federal judge would simply modify contracts that the Unions had negotiated with the City.  Although the Unions should have been on notice that the litigation could lead to changes in their contract with DWSD, they could have plausibly assumed that those changes would take place through the ordinary channels of negotiations, such as collective bargaining, rather than by the fiat of an appointed official.  There was no basis for them to believe that they had a legally significant claim to intervene upon, nor could they have had any idea what sort of relief they would need to seek until Judge Cox issued his order on November 4, 2011.   Furthermore, to the extent that the district court relied on Rule 24's technical requirements with regard to pleading, it is unfair and unrealistic to expect a party to intervene before its interest in the case has had an opportunity to crystallize.

The district court cites *Stotts v. Memphis Fire Dep't*, 679 F.3d 579, 583 (6th Cir. 1982), as standing for the proposition that AFSCME should have known that its contract would be subject to change in the course of litigation. But *Stotts* is easily distinguishable on this particular point:  there, a lawsuit to change the hiring and promotion policy of a fire department resulted in changes to the hiring and promotion policy of a fire department.  In this case, a lawsuit concerning environmental damages has, after more than thirty years, resulted in a federal judge ordering re-writes of  disparate collective bargaining agreements.  Further, at various points in this litigation, Petitioners have asserted their rights when appropriate.  By Defendant DWSD's own admission, Local

207, an affiliate of AFSCME, and AFSCME Council 25 challenged actions in 1979, obtaining favorable arbitral decisions in 1980.

A better, but still unpersuasive argument is that the Unions should have moved to intervene as soon as possible after the district court issued its order on September 9, 2011, in which the court stated that the Root Cause Committee:

> *[S]hall not* be constrained by any local Charter or ordinance provisions, or by the provisions of union or other contracts. If these local officials fail to devise and propose a workable solution to remedy the underlying causes of the serious and recurrent violations of the Clean Water Act in this case, this Court will directly order a more intrusive remedy.

(R. 2397, Opinion and Order, Dec. 9. 2011, at 3–4 (emphasis in original).) Once that district court opinion was issued, then perhaps a court could conceivably have construed the report of the Root Cause Committee as a precursor to a final judgment, and perhaps it could be argued that the Unions should have intervened during that process. However, the better and more reasonable interpretation is that the report should have indicated the need for a more urgent dialogue about seeking solutions, rather than being interpreted as the last call for intervention.

There is no question that the Unions became aware that their interests were implicated, as they had been from the very beginning of the litigation, but that is a far cry from understanding that changes to the CBAs might be imminent. For example, Macomb County filed a Motion to take Judicial Notice on July 2, 2012, which contained numerous articles from local media outlets and internal notices and leaflets from Local 207, which indicated that the union was aware of its interest in the ongoing compliance issues at DWSD.[5] (*See generally* Macomb County Mot. for Judicial Notice, July 2, 2012, Exs. 1–21.) But while perhaps the Unions could have filed earlier, other courts have found that it is reasonable to permit parties to wait to see whether intervention is

---

[5]The documents submitted do not appear to support Macomb County's contention that the union admitted that compliance with the consent order would jeopardize its members' interests; instead, they suggest that the union felt that supporting its members' interests in increased staffing would have brought the DWSD into compliance. (*See, e.g.,* Macomb County Mot. for Judicial Notice, July 2, 2012, Exs. 10, 11.)

necessary, in order to prevent unnecessary filings. *See Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018 (7th Cir. 2006) (Posner, J.). Furthermore, the general awareness that a court had given the City permission to ignore contracts, (*see* Macomb County Mot. for Judicial Notice, July 2, 2012, Ex. 16,) is not the same as having a concrete grounds for intervention; until the City or court actually abrogates or modifies a contract, it is unclear whether or not the Unions have standing to intervene or a claim that is ripe for adjudication. *See, e.g.*, *Airline Prof'ls Ass'n Int'l Bhd. Teamsters, Local Union No. 1224, AFL-CIO v. Airborne, Inc.*, 332 F.3d 983, 986–89 (6th Cir. 2003) (finding that a union lacked standing to bring a motion to compel arbitration and discussing the relationship between ripeness and standing); *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 330 F.3d 747, 751 (6th Cir. 2003) (finding a case ripe when the Postal Service "faced reasonable threat of liability if compliance with [an] arbitration order violate[d] [federal law].") And it was only after the Root Cause Committee failed to suggest changes to the CBAs that the district court took action. How were the Unions to know that they needed to intervene, when even the court could not have known?

Even though it might not have ordinarily constituted an abuse of discretion for the district court to find that factor three favored a finding of untimeliness, it becomes an abuse of discretion when one considers the unjustifiable emphasis that the district court placed on this factor to the exclusion of virtually all other considerations. This is particularly true when one considers that the lack of timeliness was not substantial, was not in any way prejudicial to any party's interests, and actually constituted a close call under the circumstances. The bulk of the district court's analysis of the timeliness of the Rule 24 motions, in all of the appealed orders, is dedicated to showing that the Unions have been aware of this litigation for a long time—an overstated point where all the parties have been aware of the decades-old duration of the litigation. Therefore, even if the district court's decision on this factor was not, itself, an abuse of discretion, the district court's elevation of this factor beyond all others requires that we reverse and remand. *See, e.g.*, *Linton v. Com'r of Health and Env., State of Tenn.*, 973 F.2d 1311, 1318 (6th Cir. 1992). Furthermore, the district court's decision conflates factors one and

three, as it cites essentially the same evidence in favor of a finding of untimeliness on each. But the factors are not the same. Factor one is concerned with what the majority terms "the orderly processes of the court," while factor three is meant to encourage parties to intervene as soon as practicable so as not to cause unnecessary delay to adverse parties (and is best understood within the context of the fourth factor, an issue that the district court overlooks.) The court below failed to make this distinction at all. And in fact, DWSD and the City appeared relatively satisfied with the pace at which the district court was proceeding, and only evinced concern about the litigation's pace when doing so gave them an apparent tactical advantage over the Unions. Furthermore, the district court itself has not specified any problem, in terms of timeliness, that would have resulted from granting the Unions' motion to intervene. Finally, if not formally illogical, it is inconsistent and capricious for a court to hold that on one hand, the Unions' purpose for intervention weighs against their intervention because their pleadings are too vague, and then find that they should have intervened earlier despite the fact that they merely had an "interest" rather than a ripe cause of action. We cannot ask prospective intervenors to plead with specificity, then also demand that they enter the litigation at the very first hint that they may have an interest in the case.

The fourth factor is "the prejudice to the original parties due to the proposed intervenor's failure, after he or she knew or reasonably should have known of his interest in the case, to apply promptly for intervention." *See, e.g.*, *Blount-Hill*, 636 F.3d at 284. The district court stated that delaying the implementation of its September 9, 2011 Order would prejudice the participants in that lawsuit, but it failed to provide any meaningful legal authority, or factual reasons why now, after thirty years, it is imperative that the district court immediately assert broad authority over municipal contracts. DWSD cites only one case, *Stotts*, but that citation merely demonstrates that if parties would suffer prejudice, then this factor favors a finding of untimeliness. *See Stotts*, 679 F.2d at 584–85. The district court lists a few facts suggesting the urgency of taking action, but does not show why these factors are unique to the past few months, or why the present non-compliance is so radically different from the prior instances of non-compliance over the past thirty-four years, none of which required the district court to assert its own broad

authority to modify the Unions' contracts. Accordingly, because of the dearth of legal or factual basis upon which the district court appears to have made its finding of prejudice to the parties, there was no basis for finding that this factor favored a finding of untimeliness.

It should be noted that to the extent that the first three prongs may be slightly different for the different intervenors, if a court were to find that any of the Unions is entitled to intervene, then the prejudice suffered by the DWSD and the City as a result of allowing the other Unions to intervene is significantly lower. As no party to this lawsuit appears to contest the notion that the Unions would have standing to sue if the City modifies the CBAs pursuant to the district court's supervision—and based on the course of this litigation, such a suit would appear inevitable—there is no reason why the existing parties would be prejudiced by addressing the Unions' positions after intervention, as opposed to in a separate suit. *Cf. Grubbs v. Norris*, 870 F.2d 343, 347 (6th Cir. 1989) (finding that the district court abused its discretion in denying a motion to intervene, and that "that addressing the problem in one lawsuit is preferable to encouraging a patchwork case-by-case approach."). Any finding of potential prejudice to the original parties because of intervention should be balanced against the inconvenience and virtual certainty of prejudice caused by inevitable, expensive, and duplicative litigation. It seems counter-productive to deny the parties intervention in this case, when there are likely to be lawsuits following any final judgments, which is precisely what factor one is used to shield against. This is all the more true in the instant case, where the district court denied intervention relatively soon after its order on September 9, 2011.

The final factor for timeliness is "the existence of unusual circumstances militating against or in favor of intervention." *Blount-Hill*, 636 F.3d at 284. The district court abused its discretion by simply ignoring this factor. (*See* R. 2413, R. 2422, and R. 2445) (failing to address factor five in any of the orders denying intervention.) The City and DWSD were able to maintain compliance for most of the thirty-year period without resort to modifying the contracts, so it is unclear why there is a sudden and dramatic

need to do so immediately. Regardless, there is simply no record below for this Court to review as to unusual circumstances.

Despite the lack of findings on this factor, it should be noted that contrary to the laments of the district court, non-compliance has been an infrequent feature of this litigation. There was an instance of non-compliance in 1997; and at various other points, including 1980 and 2000, the consent decree was amended to ensure continued compliance. But in each of these instances the Unions were involved to the extent necessary to protect their interests. Why the district court found that there was a sudden urgency to this litigation, or why the court felt that it could or should now proceed without the Unions is something of a mystery. To the extent that the district court focused on the Unions' failure to intervene when it would have required them to do so, it cannot show how the Unions should have known that this was the only, or even the best time to intervene. There has never been an indication that it was necessary, at any point in the entire history of this case, dating back to 1977, to move the court to intervene at the first conceivable possibility of a new phase of litigation, given the ability of the Unions to otherwise protect their rights through either the courts or the political process. The relevance of the length of this litigation is not, therefore, that the Unions should have seen this coming, but instead, that they had no reason to believe that the latest machinations of the City and the district court would require immediate intervention. Even when issues of staffing have been directly implicated as a possible source of compliance issues, as in 2000, when the district court directed then-Mayor Dennis W. Archer to examine the existing union contracts, there was never an order with nearly as much force or authority as the most recent round of injunctions. The primary difference between the most recent episode of non-compliance and prior instances of either non-compliance or emendations of the consent decree is not the behavior of the City, or the policies of the EPA, or the acts or interests of the Unions. Instead, the major difference is the disposition of the district court judge. It is unfair and arbitrary to tell the Unions that they have no recourse, or right to intervene, merely because the newly-assigned district court judge failed to adequately explain to the Unions how and to what extent his priorities differed from those of the prior judge assigned to the case.

Finally, it should be noted that the district court's balancing of these factors appears rote and mechanical, rather than meaningful, as the district court failed to examine obvious practical matters. While there is little risk of prejudice to the existing parties insofar as the remedial measures anticipated by these orders could be implemented after consideration of concerns raised by the intervening Unions, it will be extremely difficult to restore the *status quo ante* as embodied in the existing CBAs after the remedial measures are ordered.[6] The very purpose of intervention is to permit the parties to protect their own interests when it might otherwise cause irreparable harm to permit the litigation to go forward. It is fair to ask, for example, whether the Unions who represent the current employees will still be the proper representatives of the DWSD employees if those employees lose their jobs. While a district court cannot be expected to examine all potential issues or practical matters, this district court's failure to even consider the most basic of these practicalities is strongly suggestive of an inappropriate exercise of discretion. Furthermore, the actions of the district court since this appeal was taken appear to confirm that the district court's decision was motivated by something other than efficient docket management. While this appeal has been pending, the district court has ordered DWSD to unilaterally modify agreements for wages and benefits, exempted DWSD from all city rules concerning labor relations, and asked the parties to provide arguments as to why the court should exempt the parties from Michigan state statutes providing for labor mediation. And of course, because the court has not permitted the Unions to intervene, these issues are to be decided without the participation of the Unions themselves. Because the district court incorrectly analyzed at least three of the timeliness factors, failed to even consider one of the factors, and improperly placed too much weight on the remaining factor, I would find that the district court abused its discretion in denying the motions to intervene.

While the majority agrees that the decision below cannot stand, it favors some form of "limited intervention." This approach is incompatible with our review of timeliness for abuse of discretion. Decisions regarding timeliness are reviewed for abuse

---

[6]While the prejudice prong addresses only prejudice to the original parties, the district court could have considered this under both the progress of the litigation and purposes of intervention prongs.

of discretion because we presume that decisions regarding its own docket are best left to the trial court. Moreover, because the appropriateness of intervention is often highly dependent on the specific contours of the litigation, it is extremely difficult to create useful, broadly applicable rules of law regarding intervention, which is recognized by courts insofar as they use a five-factor balancing test as the basic framework for intervention. Unlike other cases, where a court of appeals may base its decision on any grounds fairly supported by the record, *see, e.g.*, *Corell v. CSX Transp., Inc.*, 378 F. App'x 496, 499 (6th Cir. 2010), the nature of abuse of discretion review limits us to a review of the actual decision of the district court; this is because discretion implies that there are different acceptable outcomes, and that a reviewing court is only concerned with the process by which the lower body reached its decision. *Cf. Baker v. United Mine Workers of Am. Health & Retirement Funds*, 929 F.2d 1140 (6th Cir. 1991) (applying an abuse of discretion review to a non-judicial actor and declaring that it requires that a "decision be upheld if it is the result of a deliberate, principled reasoning process . . . ."); *see also Abrams v. Interco, Inc.*, 719 F.2d 23, 28 (2d Cir. 1983) (Friendly, J.) ("It is not inconsistent with the discretion standard for an appellate court to decline to honor a purported exercise of discretion which was infected by an error of law.") And we limit our review to the actual decision for the same reason we review only for abuse of discretion: this Court is not the ideal forum for this question. Because we recognize that the district court is usually a more appropriate decision-maker on the question of timeliness, we examine whether the district court has properly exercised its discretion in reaching that decision.

It should also be noted that while timeliness is reviewed for abuse of discretion, all of the other factors under Rule 24 are reviewed *de novo*.[7] *Coalition to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007) (quoting *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 344 (6th Cir. 2007)); *United States v. Michigan*, 424 F.3d 438, 443 (6th Cir. 2005) (citing *Grutter v. Bollinger*, 188 F.3d 394, 398 (6th Cir. 1999)); *Jordan v. Mich. Conference of Teamsters Welfare Fund*, 207

---

[7]Where the district court failed to make any findings of fact, the decision regarding timeliness is reviewed *de novo*. *See Blount-Hill v. Zelman*, 636 F.3d 278, 283 (6th Cir. 2011).

F.3d 854, 862 (6th Cir. 2000) ("In considering a district court's denial of a motion to intervene pursuant Rule 24(a)(2), we review the district court's timeliness determination for abuse of discretion, where the three remaining Rule 24(a)(2) factors are reviewed *de novo*.") But because timeliness is a threshold issue, the district court did not address the other factors for intervention, and as a result, this Court has not been presented with a full briefing or argument as to the appropriate scope of intervention. If, as the majority argues, the district court should be permitted a great deal of authority to administer this dispute, then the logical solution would be a general remand, unless there is some unexplained reason for the majority's position, such as a desire to minimize the Unions' participation in the litigation to the greatest extent possible.

The majority's decision, while phrased in terms of abuse of discretion review, goes beyond reviewing the lower court's analysis of timeliness. It provides directives as to the appropriate scope of intervention, and as to what issues the district court should and should not address. But as previously indicated, the appropriate scope of intervention has never been argued or briefed before either the district court or this Court. And many of the issues that the majority directs the district court not to hear, such as labor disputes between the Unions and the City, may be critical to the court's enforcement of the underlying environmental litigation. In fact, the district court's reasoning as to why it denied intervention in the first place acknowledged that these issues had been present in the case since at least 1978. Therefore, there is no basis on the record before us to reverse on timeliness grounds while also stripping the district court of much of its discretion to shape the litigation.

Finally, the majority relies on a series of cases which, while instructive, are easily distinguishable from this case. If anything, the primary meaning of those cases is that there is no general rule for when a court of appeals should affirm a decision regarding intervention. For example, the majority contends that *Michigan Ass'n for Retarded Citizens v. Smith*, 657 F.2d 102 (1981), provides significant support for its decision. While this case is superficially similar, *Michigan Ass'n* is by no means controlling.

There are several key differences between *Michigan Ass'n* and the instant case.[8]  For example, in *Michigan Ass'n*, there was an existing injunction, which was being enforced and monitored by the district court, unlike the present case, where the court has merely threatened to fashion a remedy.  The plaintiffs' class in *Michigan Ass'n* was largely filled by individuals with mental disabilities, living in unacceptable conditions, rather than municipal entities or their residents.  Accordingly, there was good reason for the court in *Michigan Ass'n* to be particularly concerned with the prejudice prong of the timeliness inquiry.  In this case, there has merely been a sixty-day period of non-judicial fact-finding by a committee appointed by the district court.

Similarly, the majority relies heavily on *Stotts v. Memphis Fire Dep't*, 679 F.2d 579 (6th Cir. 1982).  As with *Michigan Ass'n*, there are obvious similarities with the instant case,[9] but there are also significant differences.  In *Stotts*, the underlying case was directly related to the claimed interest of the proposed intervenors, and it is not clear that the intervenors had a legally protected interest requiring their intervention.  Furthermore, there was clear prejudice to one of the parties to the initial lawsuit.  Finally, in *Stotts*, the appellate court could point to the district court's "careful and delicate consideration of the factors for determining timeliness," which we certainly cannot do today.

---

[8]In *Michigan Ass'n for Retarded Citizens*, the plaintiffs' class, which consisted of mentally challenged adults and various non-profit groups, obtained a consent judgment against the regional director of the State Department of Mental Health and the director of a particular institution where the individual plaintiffs resided.  657 F.2d at 104.  Prior to obtaining this consent judgment, the district court had entered a preliminary injunction, which ordered monitoring of the institution, as well as monthly reports to the court from the monitors.  *Id.*  The consent judgment was entered after significant time was spent in negotiations between the parties.  *Id.*  After the entry of the consent judgment, AFSCME Council 25 attempted to intervene, stating that the reduction in residents at the institution contemplated by the consent agreement would likely lead to a reduction in the number of union employees needed there.  *Id.*  The district court denied the application, and the Sixth Circuit affirmed, stating that because the motion was filed after the unions "were aware of the broad scope of the litigation, and also in view of the fact that intervention at this late date would work to delay implementation of the remedial provisions of the Consent Decree to the detriment of the residents of [the institution]."  *Id.* at 105.

[9]In *Stotts v. Memphis Fire Dep't*, this Circuit again affirmed a district court's denial of a motion to intervene. In that class-action lawsuit, plaintiffs alleged that the Memphis Fire Department used racially discriminatory hiring and promotion policies.  *Stotts v. Memphis Fire Dep't*, 679 F.2d at 580.  After three years of discovery, and "months of negotiations," non-minority firefighters moved to intervene.  The district court denied the motion, and the Sixth Circuit affirmed that decision.  Specifically, it found that the intervenors did not have a legally protected interest in the case, *id.* at 582, that it was obvious from the outset that a lawsuit about the hiring and promotion policies of the fire department might change the hiring and firing policies of the fire department, *id.* at 583, and that the court had given the intervenors a chance to voice their objections to the decree.  *Id.* at 584.  The court further found that there would be prejudice to the public if there was any further delay in the implementation of the new promotion policy.  *Id.* at 585.

In addition to the fact that the cases relied upon by the majority are distinguishable, at least one case supports the opposite conclusion. In *Grubbs v. Norris*, prisoners in Tennessee sued the state, challenging conditions of confinement. After the district court ordered the state to reduce the number of inmates held in state facilities, the state stopped transferring inmates to state prisons, and held them in county and local jails instead. *Grubbs v. Norris*, 870 F.2d 343, 344 (6th Cir. 1989). Because of this, the population of a local jail became greater than its permitted capacity, and that local jail moved to intervene as a plaintiff. The district court denied its motion to intervene. *Id.* at 344. The Sixth Circuit reversed, finding that the local jail could not have intervened prior to the district court's remedial order, which "triggered [the jail]'s clear interest in the action." *Id.* at 346.

Even though *Grubbs* is the most instructive of these cases, because it addressed timeliness in the context of agencies of the municipal government, and because the intervenors' right of intervention derived from the implementation of equitable relief between two other parties, the bigger point that these cases illustrate is why we review decisions on timeliness for abuse of discretion: there is no general rule that can adequately cover all of the concerns of a district court in deciding whether intervention is appropriate.[10] Because the district court's stated reasoning failed to properly apply the complete five-factor test, misapplied factors that it did analyze, improperly weighed its analysis to one of the factors, and made claims unsupported by either precedent or the factual record, I would find that the decision was an abuse of discretion, and remand with instructions to permit the Unions to intervene.

### C.     Rule 19, the All Writs Act, and Federal Constitutional Challenges

Turning from the district court's decision as to the motions to intervene, the fact of the matter is that the orders entered by the district court do not make a great deal of sense. Even if one characterized the Unions' purportedly late interventions as

---

[10]Moreover, the case law in this area can only be so instructive; there are simply not that many comparable instances of intervention after over thirty years of non-adversarial litigation with which to compare the instant case.

gamesmanship by their attorneys, and even if one found that the district court had properly analyzed the factors under Rule 24, then there is still reason to vacate the district court's orders: without the participation of the Unions, these orders exceed the authority of the district court. Accordingly, I would also vacate the orders pursuant to Rule 19. Because we remand the orders to the district court, it is unnecessary to address Rule 19 in full; however, to the extent that the majority's decision may permit the district court to significantly impair the Unions' ability to be heard, I note some components of Rule 19 that may in the future call the orders of the district court into doubt.

Local 207 and the SAAA argue that the district court's injunction implementing the order of November 4, 2011 is in violation of Federal Rules of Civil Procedure 19 and 65, the All Writs Act, 28 U.S.C. § 1651, and the Due Process Clause of the Federal Constitution, U.S. Const. amend. V, and Council 25 adds an argument under the Contracts Clause. U.S. Const. art. I, cl. 1. Because the majority finds that the motion to intervene was timely, there is no need to address the constitutional issues; however, in crafting a procedure below, the district court should be mindful of the extent to which the Unions must be permitted to participate in the litigation.

The Unions contend that the district court violated Rule 19(b) by failing to join the Unions in the action as indispensable parties. While this argument was not raised by any of the parties below (presumably because the existing parties oppose intervention), and the Sixth Circuit has never ruled on whether a non-party can raise an objection based on Rule 19, other courts have held that "a Rule 19 objection can even be noticed on appeal by a reviewing court *sua sponte*." *Pickle v. Int'l Oilfield Divers, Inc.*, 791 F.2d 1237, 1242 (5th Cir. 1986) (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102 (1968)); *Kimball v. Florida Bar*, 537 F.2d 1305, 1307 (5th Cir. 1976); *see* 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1609 (3d ed. 2001); *see also GTE Sylvania v. Consumer Product Safety*, 598 F.2d 790, 798–99 (3d Cir. 1979) (recognizing the power of the court to raise the issue *sua sponte* but declining to do so where "[the parties] *could have intervened* in the . . . litigation without significant burden.") (emphasis added). *But see Hoots v. Pennsylvania*, 495 F.2d 1095,

1096 n.3 (3d Cir. 1974) (holding that a court of appeals may only do so when an appeal has been raised by an existing party to the case.).   Further, "a court of appeals should, on its own initiative, take steps to protect the absent party, who of course had no opportunity to plead and prove his interest below." *Provident Tradesmens*, 390 U.S. at 111–12.[11]

Ordinarily, a district court ruling on whether party is necessary to an action under Rule 19(a) is reviewed for abuse of discretion, whereas a decision on whether a party is indispensable under 19(b) is reviewed *de novo*.  *Keweenaw Bay Indian Cmty v. Michigan*, 11 F.3d 1341, 1346 (6th Cir. 1993).  Local 207 and the SAAA argue that they were indispensable parties, but later cite the text of Rule 19(a), which governs necessary parties.  In any event, there is no district court decision to review.  So were this argument presented under Rule 19(a), this court acting *sua sponte* to address a question of law would still necessarily examine the issue *de novo*.  However, in addition to the standard Rule 19 inquiry, a court of appeals must also consider the impact of its decision given the existence of a binding order entered after the completion of litigation. *GTE Sylvania*, 598 F.2d at 798 (citing *Provident Tradesmens*).

Courts in this Circuit use a three-step process for determining joinder under Rule 19. *See, e.g.*, *Keweenaw Bay*, 11 F.3d at 1345.  First, a court should examine whether a party is necessary pursuant to Rule 19(a).  *Keweenaw* at 1345.  That rule states that:

> (a) Persons Required to Be Joined if Feasible. (1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

---

[11]*Provident Tradesmens* examined the 1966 revision to Rule 19. While the rule has been amended since, the 1966 revision was the last major substantive revision to the rule.

Fed. R. Civ. P. 19(a).  Should a court find that a party falls within either of these two categories, then it must turn to personal jurisdiction and indispensability.  *Keweenaw* at 1345.  If there is personal jurisdiction, then the court should join the party, while if there is not, then the court should examine whether it ought to proceed without the necessary party or dismiss on the grounds of indispensability.  *Id.* at 1345–46.

As a general matter, a union is always an interested party when the construction of its collective bargaining agreement is an issue.  *See* 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1620 (3d ed. 2001); *see, e.g.*, *Teamsters Local Union No. 171 v. Keal Driveaway Co.*, 173 F.3d 915, 918 (4th Cir. 1999) (finding a union necessary under Rule 19(a) where the "action at bottom concerns the joint grievance panel's interpretation of the collective bargaining agreement . . . "); *Johnson v. Colts, Inc.*, 306 F. Supp. 1076, 1079 (D. Conn. 1969) ("The interest of the unions in the construction of the collective bargaining agreement is self-evident . . . ")  And no one contests that there is personal jurisdiction over the Unions.  While Rule 19 is a companion to Rule 24, it does not simply mirror it.  Where the district court has resolved a Rule 24 motion on the basis of timeliness, Rule 19 provides a separate basis upon which to challenge the district court's decision.

Therefore, reading Rule 19 as a direct analogue to Rule 24 is only true insofar as a court has ruled on the merits of a proposed intervenor's motion under Rule 24. While this Court has held that Rule 19 cannot be used to "in an effort to excuse the deficiencies of [a] Rule 24 motion," *Lyndon Prop. Ins. Co. v. Katz*, 196 F. App'x 383, 390 (6th Cir. 2006), it has only done so when a lower court's denial of intervention under Rule 24 subsumed the proposed intervenor's challenge because the court had ruled that the intervenor lacked a sufficient legal interest.  *Lyndon*, 196 F. App'x at 389.[12] Here, the court denied intervention on the basis of timeliness, but timeliness is only a threshold factor under Rule 24.  Once timeliness is established, a court looks to: "2) the

---

[12]One might also read *Hoots v. Pennsylvania*, 495 F.2d 1095, 1096 n.3 (3d Cir. 1974) as stating that courts should not create procedures that permit parties to circumvent Rule 24 through Rule 19.  As with the *Lyndon* decision, the court below had reached the merits of the proposed intervention, *Hoots* at 495 F.2d at 1096, and the primary objection from the Third Circuit concerned the nature of its appellate jurisdiction.

applicant's substantial legal interest in the case; 3) impairment of the applicant's ability to protect that interest in the absence of intervention; and 4) inadequate representation of that interest by parties already before the court." *Jordan v. Michigan Conference of Teamsters Welfare Fund*, 207 F.3d 854, 862 (6th Cir. 2000) (citing *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir.1997)). And while timeliness is based on the district court's inherent authority to control its own docket, the other factors under Rule 24 address the underlying legal relationship between the proposed intervenor and the cause of action. The difference between timeliness and the other factors is reflected in the way we review district court decisions; as noted earlier, all of the factors under Rule 24 are reviewed *de novo*, except for timeliness, which is reviewed for abuse of discretion. *Coalition to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007). In this case, no one disputes that the Unions have a significant legal interest in the case, nor that had the motions been considered timely by the district court, they would have been permitted to intervene.

Perhaps the stronger argument is that because Rule 19 uses the same language as Rule 24, if it were truly a separate basis for evaluating the ruling, then the timeliness language of Rule 24 would be a nullity. But that argument would also fail, because while Rule 19(a)(1)(B) mostly mirrors the language of Rule 24(a)(2), Rule 19(a)(1)(A) contains an additional rule, that a court should join a party if "in that person's absence, the court cannot accord complete relief among existing parties . . . ." There is no question that the district court's order cannot be properly implemented without the Unions. The existing parties admit this. And the fact remains, no one has questioned that many of the remedies proposed by the district court would ordinarily give rise to a Union-backed cause of action. The solution to this problem proposed at oral arguments was that the Unions, or individual members of the Unions, could bring direct suits later. But this piecemeal approach is as impractical, expensive, and inefficient as it is fanciful and unlikely.

Unlike the other provisions of Rule 19, which favor parties themselves bringing in necessary parties so that the court can efficiently dispose of claims, Rule 19(a)(1)(A)

specifically addresses the court's ability to complete the case as presented. While it is rarely used completely independently of the remainder of the rule, 4 *Moore's Federal Practice* § 19.03 (3d ed. 2012), in this case the other conditions are already satisfied. And while courts tend towards a narrow reading of the rule, favoring a view that addresses only relief as between the extant parties, *id.*, even that reading would support adding the Unions to this case because relief between the parties is bound up in their ability to modify the Unions' CBAs.

The final remaining question with respect to Rule 19 is that even though this court can unquestionably raise Rule 19 *sua sponte*, *see Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102 (1968); *Mastercard Int'l Inc. v. Visa Int'l Svc. Ass'n, Inc.*, 471 F.3d 377, 382–83 (2d Cir. 2006); 4 *Moore's Federal Practice* § 19.02 n.63 (3d ed. 2012), there may be no appellate jurisdiction once the question of intervention has been settled. There are serious defects with this argument. For example, in *NLRB v. Doug Neal Mgmt. Co.*, 620 F.2d 1133, 1139 (6th Cir. 1980), the Court raised Rule 19 *sua sponte* as part of a direct appeal. The Court said nothing about whether a court could raise it at a different time, and the language of the opinion strongly supports a court's ability to raise the issue at any time. *See id.* That case also held that the inquiry into this issue should be pragmatic, rather than overly technical, *id.*, and other cases have agreed. *See Bowling Transp., Inc. v. NLRB*, 352 F.3d 274, 281 (6th Cir. 2003) (finding that Rule 19 may be raised *sua sponte* though finding that a party was not indispensable); *see also id.* at 286 (Boggs, J., concurring in the portion of the opinion that approved of courts of appeal raising Rule 19 *sua sponte*). Further, because the posture of this case is effectively non-adverserial, it is unlikely that there will be a direct appeal in the conventional sense of that procedure.[13]

---

[13]Even if, for some reason, our ability to raise Rule 19 *sua sponte* was somehow impaired because it was too attenuated from the issue on direct appeal (and the nature of a *sua sponte* issue is that it is an issue we can raise so long as we have jurisdiction over the case itself,) I would still find that we would have pendent appellate jurisdiction over a Rule 19 issue. An appeal from a denial of a motion to intervene under Rule 24 is immediately appealable under the collateral order doctrine. *Northrop Grumman Corp. v. TRW, Inc.*, 40 F. App'x 124, 125 (6th Cir. 2002); *see Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 375–76 (1987) (no right of interlocutory appeal where intervention as a right is denied but permissive intervention is granted). And once appellate jurisdiction vests in this Court, we have the ability to take pendent appellate jurisdiction over any inextricably-intertwined issue. *Turi v. Main Street Adoption Services, LLP*, 633 F.3d 496, 502–03 (6th Cir. 2011). A decision is "inextricably

Accordingly, the district court should consider, in deciding how to properly join the Unions, not merely the extent to which it can limit their participation, but also the full extent to which it must give them an opportunity to be heard lest its orders be defective under Rule 19. *See, e.g., EEOC v. McLean Trucking Co.*, 525 F.2d 1007, 1012 (6th Cir. 1975) (reversing and remanding with instructions to join where it found that a union was indispensable, but that their joinder was feasible, and that the interests of "time, effort, and expense" justified addressing the matter in a single proceeding).

I therefore respectfully dissent.

---

intertwined with a claim that is independently reviewable if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal." *Id.* at 503; *see also Swint v. Chambers Cty. Com'n*, 514 U.S. 35, 44 n.2 (1995) (collecting cases on the exercise of pendent appellate jurisdiction). (In *Swint*, the Supreme Court reversed the Eleventh Circuit's exercise of pendent appellate jurisdiction, but specifically did not address the context presented in the instant case). *But see Mastercard v. Visa*, 471 F.3d at 384 (finding that where a Rule 19 motion was not covered by the collateral order exception, it could nevertheless be reviewed through pendent appellate jurisdiction). In *Mastercard*, the court found it necessary to address Rule 19 in order to determine jurisdiction (had the party been added, there would have been no diversity jurisdiction), but did not hold that there are no other circumstances under which pendent appellate jurisdiction would be available. In this case, if the district court could not issue its initial order, which prompted the intervention, without the presence of the parties, there would be an analogous defect in its decision, and we should therefore take jurisdiction of the Rule 19 issue.